UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
HARWINDER VILKHU,

                         Plaintiff,           06 Civ. 2095 (CPS) (JO)

        -against-


CITY OF NEW YORK, POLICE OFFICER and/or
SERGEANT MICHAEL HOEHL, and POLICE
OFFICER ADAM JANGEL.,

                    Defendants.


------------------------------------------------------------x

**DECLARATION OF MARIANN MEIER WANG IN SUPPORT OF PLAINTIFF'S
MOTION FOR ATTORNEYS' FEES, COSTS, AND INTEREST**

     I, MARIANN MEIER WANG, an attorney duly admitted to practice in the Eastern

District of New York, declare under penalty of perjury:

     1.      I am a partner at Emery Celli Brinckerhoff & Abady LLP ("ECBA"), and lead

counsel for Plaintiff Harwinder Vilkhu in this matter. I make this declaration in support of an

application for attorneys' fees and costs pursuant to 42 U.S.C.§ 1988 covering the hours and

costs that Kennisha A. Austin, Jonathan S. Abady, Eric Hecker, Ilann M. Maazel, Sarah Netburn,

myself, and all law clerks and paralegals who worked on this case for ECBA have expended on

this matter. I am familiar with the facts discussed herein and attach as exhibits true and correct

copies of the documents mentioned herein.

     2.      All attorneys, paralegals, and law clerks at ECBA are instructed to maintain

contemporaneous time records reflecting the time spent on this and other matters. Time is kept

one of two ways at ECBA. It is either typed into a computer program directly by the timekeeper,

or the timekeeper maintains a handwritten log or dictation recording of the daily time, which is

then typed into the computer timekeeping program by a staff assistant. In both situations, the

timekeeper indicates the date and amount of time spent on a task, describes the work that was

performed during the specified time period, and identifies the case to which the time should be

charged. Pursuant to that system, attached as Exhibit A is a full and correct copy of those time

entries relating to the work conducted for this action.

## ECBA'S INVOLVEMENT IN THE MATTER

3.     Plaintiff, Harwinder Vilkhu, retained ECBA in July 2005, just two months after

he had been the victim of police brutality by New York Police Department ("NYPD") officers on

May 8, 2005. ECBA was retained on a contingency basis, relying on the fee-shifting provision

of 42 U.S.C. § 1988.   A close relationship developed between plaintiff's counsel and plaintiff

during the several years this case was litigated, as counsel represented plaintiff through his 50-H

hearing, fourteen hours of deposition, and through ten days of trial.

4.     This matter became active immediately. At the time of retaining ECBA, Mr.

Vilkhu had already filed a complaint with the Civilian Complaint Review Board ("CCRB"),

seeking to have the officers who had brutalized him held accountable and disciplined.

Accordingly, as his attorney, I began communicating with the CCRB investigator handling Mr.

Vilkhu's complaint.   I also filed a Notice of Claim on Mr. Vilkhu's behalf, preserving his right

to bring claims against the City of New York for state law violations, and represented him

throughout that process, including at a hearing conducted by an attorney for the City pursuant to

Section 50-H of the General Municipal Law.

5.     In late April and early May, 2005, we prepared and filed the instant civil rights

case on Plaintiff's behalf in the Eastern District of New York pursuant to 42 U.S.C. § 1983 for

excessive force, false arrest, and various state law claims against the only known NYPD officer

at that time, Michael Hoehl, several "John Doe" officers – all of whom either participated in the brutality Mr. Vilkhu suffered or witnessed it, but failed to intervene – and the City of New York, as employers of the officer defendants.  Through discovery, the "John Doe" officers would later be identified as: Adam Jangel, Stephen Samartino, James Long, and Jeffrey Cline.

6.       Two days *after* the Defendants' Answer was due, on May 31, 2006, Arthur Larkin, an attorney from the City Law Department, appeared in this case on behalf of Defendants, requesting a 60-day extension of Defendants' already-lapsed time to answer.

7.       Notwithstanding the fact that their deadline to answer had already passed, I had nonetheless attempted to reasonably accommodate Defendants' request for an extension earlier that day by proposing that the extension be limited to thirty days.  In the alternative, I suggested that Defendants could have another sixty days to answer provided that the parties simply schedule a Rule 26(f) conference within the next thirty days to comply with that rule's mandate that the parties confer regarding discovery "as soon as practicable."  Defendants flatly refused even to explore a compromise in any form, and immediately sought a Court ruling instead.  (*See* Ex. B, Letters from A. Larkin and M. Wang to Court, dated May 31, 2006 and June 2, 2006.)

8.       Incredibly, while seeking their belated 60-day extension on May 31, 2006, Defendants at the same time served Plaintiff with discovery requests without bothering to engage in any Rule 26(f) conference at all.  (*See* Ex. B, Letter from City Law Department to M. Wang dated May 31, 2006.)

9.       Although clearly contravening the Federal Rules of Civil Procedure (because Defendants sought discovery without first complying with the requirement of a Rule 26(f) conference), plaintiff provided responsive material, including a requested release for Mr. Vilkhu's criminal record, and proposed a protective order for the requested release of his medical

records, precisely to encourage movement on the case.

10.     Through the course of the case, Defendants' disregard of the rules extended beyond federal rules to the Local Rules and the individual rules of the Magistrate Judge.  At various points, Defendants, *inter alia*, stridently claimed that Plaintiff had improperly served Requests for Admission in violation of a local rule applicable only in the Southern District of New York (and even then, inapplicable to Requests for Admission) (*See* Ex. C, Letter from Mr. Larkin dated October 12, 2006; Response from M. Wang dated October 13, 2006.); negotiated a schedule without any awareness or regard to the detailed form schedule required by Judge Orenstein's individual rules; and filed a reply letter in violation of the same (*See* Docket Entry ("DE") 18) ("In resolving the parties' dispute, I have not considered the Defendants' reply letter, docket entry 15, which was submitted in violation of Rule III.A of my individual practice rules.).)

11.     From the City's first appearance into this case in May 2006, through Plaintiff's victory at trial in October 2008, and even through the present day, every aspect of the case has been contentious.  For example, it took three months to enter a protective order in this case due in large part to defense counsel's unreasonable positions on numerous provisions related to the various proposed orders that were sent back and forth between the parties.  (*See* Ex. D, Letters between Counsel Concerning Protective Order, June 14, 2006 through October 23, 2006.)  Often Plaintiff's offers of compromise regarding the proposed protective order were met with new proposed protective orders altogether or proposed orders that in no way reflected the agreement the parties had reached regarding the proposed order.  (*See id.*)  In addition, Defendants never voluntarily provided any information whatsoever – despite their obligations to do so – and Plaintiff had to fight hard to obtain documents and other disclosures that laid bare the facts that

supported his claims.

**Discovery – September 2006 through April 2007**

12.     Once the lawsuit commenced, formal discovery alone spanned over one year.  In total, Plaintiff propounded and/or responded to 47 document requests, 32 interrogatories, and took or defended 28 depositions.  As a result, Plaintiff produced nearly eight hundred pages of documents to Defendants, and reviewed and organized nearly a thousand pages of documents produced by Defendant.  Additionally, Defendants produced in the weeks before trial many new pages materials obtained from subpoenas that were never copied to Plaintiff and hundreds of pages of one of their expert's prior testimony in response to the Court's sanction, necessitating additional last-minute document review in the midst of intense trial preparation.

13.     Plaintiff served his First Request for the Production of Documents on September 15, 2006.  Despite agreeing to Defendants' request for an extension of time to respond to those requests, Defendants failed to produce responsive documents even on the adjourned date, requiring Plaintiff to send repeated letters demanding the materials.  (*See* Ex. E, Letter from A. Larkin, October 16, 2006; Letter from M. Wang, October 30, 2006.)

14.     Notably, before timely responding to Plaintiff's document requests and after receiving Plaintiff's consent for an extension of time to do so, Defendants instead served an Offer of Judgment pursuant to Fed. R. Civ. P. 68 in the amount of $15,001.00.  (*See* Ex. F, Offer of Judgment, October 25, 2006.)  Plaintiff rejected the offer.

15.     When at last documents were produced, on or about October 30, 2006, they comprised only a portion of the paper file relating to the Civilian Complaint Review Board ("CCRB") investigation of Mr. Vilkhu's complaint – nearly all pages that Defendants had already produced as part of their initial disclosures – and no information concerning other

allegations of misconduct against the Defendant officers or responses that would identify the other officers who responded to the scene at York College the night of the incident. We then attempted through repeated letters, e-mails and telephone calls to convince Defendants to comply with their disclosure obligations. In telephone calls and letters, I and my colleague, Kennisha Austin, repeatedly cited to extensive case law directly on point from this Court and the Southern District of New York requiring that the City produce CCRB and personnel records relating to other complaints of abuse by the same officers. Likewise, we tried to convince Defendants of their basic requirement to undertake meaningful investigation to identify any officers who could have been present at or otherwise witnessed the incident at York College that evening. Defendants steadfastly refused. Plaintiff had no choice but to seek the Court's assistance in procuring Defendants' compliance. (*See* Ex. G, Correspondence Concerning Discovery, November 8, 2006 through November 21, 2006.)

16.     In conferences before Magistrate Judge Orenstein, the Court ruled in Plaintiff's favor on both issues, chastising Defendants on both points. At the December 4, 2006 conference, the Court extensively questioned Defendants on its position with respect to prior complaints against the officers and expressed profound frustration at Corporation Counsel's insistence on litigating an issue that the City constantly lost:

> Your office continues to litigate and lose this issue. I'd appreciate if when you continue to do so, if you decide to continue to do so [as] you at least have – [that] you . . . take the trouble to explain to me – [and] the other magistrates have to continually review this – what makes the case at bar different from the other cases *where the exact same issue came up and was resolved against you.*

(Ex. H at 9:14-20 (emphasis added)) (True and Correct Excerpted Copy of Conference Tr., dated December 4, 2006.)

17.     This was a significant early victory for Plaintiff, which produced documents that

6

disclosed information that would become critical to Plaintiff's case at trial.  As this Court is well aware, the complainants identified through those CCRB records became crucial, as both a basis for cross-examining Defendants, and as the source of identifying rebuttal witness Harry Nixon, who had been hit with a flashlight by Defendants just one month after Mr. Vilkhu.

18.     Also during this conference, Defendants demonstrated their continuing disrespect when Magistrate Judge Orenstein observed defense counsel "rolling his eyes" while the Court was speaking.  (*See id.* at 6:16-17) (The Court to Mr. Larkin: "You recognize that generally admissible – you're rolling your eyes.  Am I annoying you?").

19.     Discovery was inordinately contentious in many other ways as well, resulting in the parties spending a significant amount of time resolving discovery issues that should have never arisen in the first instance.  For example, as noted above, Defendants sought to prevent discovery in this matter of the identities of numerous individuals with potentially relevant information as they are required to disclose under Fed. R. Civ. P. 26.  The Court categorically rejected Defendants' position on this obviously discoverable issue during the December 4 conference and entered an Order setting forth the same.  (*See* Ex. I, at 2) ("The Defendants shall make further inquiry to ensure that the plaintiff has any document reflecting the identity of officers who responded to a certain radio call on the date of the incident.  To the extent the Defendants have information about the identities not reflected in any such document, they will promptly provide it.") (Order by Orenstein, M.J., dated December 4, 2006.)

20.     As would become their practice, despite the clear Court Order, Defendants did not comply with their disclosure obligations regarding any potential witnesses to the assault upon Plaintiff.  So, *again* this issue was the subject of extensive briefing regarding Defendants' untenable position and *again* the Court ordered Defendants to produce the required discovery,

while chastising Defendants' conduct. (*See* Exhibit J at 6:16-7:4) (True and Correct Excerpted Copy of Conference Tr., dated, dated January 23, 2007); (*see also* Exhibit K at 3, Order by Orenstein, M.J., dated January 24, 2007) ("I further reiterated that the City's obligation under my earlier order is to produce *any* document that can help reveal the identity of the officers who were present at the incident . . . with respect to any officer whom the City has not identified as having been present at the scene of the incident by January 31, 2007, the City will be precluded from calling that officer as a witness or eliciting evidence about that officer's presence at the scene of the incident.") (emphasis in original).

21.     Once again, this fundamental and basic disclosure – one that should not have required any Court intervention, much less repeated Orders – ended up being crucial to the case. It was only through this means that Plaintiff had the opportunity to depose Edward Goutink, a non-party police officer who was identified for the first time just days before January 31, and who came forward with a patently incredible, fabricated story to support his colleagues. Goutink claimed that he distinctly remembered Mr. Vilkhu from years before, based solely on an alleged ten-minute interview of Mr. Vilkhu as he sat in the back of an ambulance on the evening of May 8, 2005, "flailing" his arms, seeming intoxicated, and supposedly never once mentioning that he had been hit by the police. Plaintiff's cross-examination of Goutink on the stand at trial – eliciting the gross inconsistencies in his testimony at deposition and at trial, the fact that the EMT worker who sat next to Mr. Vilkhu in the ambulance never once saw Goutink conduct such an interview, and the incredible claim that Goutink was able years later instantly to link the man in the back of the ambulance to his friend Adam Jangel's momentary reference to a lawsuit that arose from "the incident at York College" – were all possible only because of this hard-fought discovery. (*See* Ex. L at 999:19-20; 1000:10-24; 1001:20-23; 1016:4-17; 1016:22-1019:9;

1020:21-1023:5) (Trial Tr., dated October 8, 2008.)

22.      Indeed, Defendants' recalcitrance in discovery extended far beyond these two issues. Plaintiff spent an inordinate amount of time not only policing Defendants' conduct in order to ensure compliance with their discovery obligations, but also attempting to reason with Defendants about their own unreasonable discovery requests of Plaintiff.

23.      For example, Defendants objected to Plaintiff videotaping a deposition (despite receiving substantial notice that the deposition may be taped and having no other basis whatsoever for that refusal), and insisted instead on burdening the Court for a ruling before proceeding.  The Court denied Defendants' application and ordered that the deposition proceed. (*See* Ex. M, Order dated February 7, 2007.)

24.      Defendants' obstructive behavior persisted when they refused to consent to Plaintiff's filing an amended complaint despite the permissive standard of Rule 15 and the Court's plain indication during a court conference to the parties that it saw no reason not to grant such an application.  Defendants' unreasonableness resulted in Plaintiff having to file a letter motion on February 15, seeking leave to file the Amended Complaint.  (*See* DE 56.)  Defendants – after seeking an extension of time to oppose Plaintiff's motion – filed their three-page opposition eight weeks later on April 6, 2007.  Three days later, on April 9, the Court granted Plaintiff's motion for leave to file the Amended Complaint.  (Order dated April 9, 2007.)

25.      Defendants also instructed Defendant Michael Hoehl during his deposition not to answer any questions concerning five photographs of the York College location, without asserting any privilege as a basis for refusal, and despite defense counsel having been offered time to review the photographs on a lunch break or otherwise off the record with his client to eliminate any alleged lack of notice.  (Ex. HH at 27-28.) In his Order, requiring Defendant Hoehl

to "appear for a continuation of his deposition to answer the questions that his counsel would not

let him answer before," Magistrate Judge Orenstein described "such tactics" as "improper."[1] (Ex.

K at 6.)

26.     Defendants also insisted on two full days – fourteen hours – for plaintiff's

deposition in a case where the core incident was a half hour to forty-five minutes long at most.

Plaintiff attempted to compromise with Defendants – we offered instead to make Mr. Vilkhu

available for several hours more than the presumptive seven, but not for an entire additional day.

(DE 59.) Defendants obtained the Court's permission to proceed for another full day based on

arguments that they had not yet questioned Mr. Vilkhu on a number of areas such as his cell

phone records. Yet much of the second day was spent not on any of those "new" areas but on re-

reviewing the details of the incident in endless ways, including by repetitively reviewing the

numerous prior sworn statements concerning the incident on which Mr. Vilkhu had already been

questioned.

27.     Defendants' insistence on wasting attorney time and resources on unnecessary

depositions continued when they conducted the depositions of four of plaintiff's treating

physicians. In an effort to avoid these unnecessary depositions, I repeatedly represented to

Defendants that Plaintiff had no intention of calling the treating physicians at trial and would

instead call only a medical expert who would opine on those physician's underlying records. I

noted that none of these doctors' had any significant independent recollection of Mr. Vilkhu and

simply testified to what was in their records. Defense counsel ignored Plaintiff's offer and

wasted time deposing all four individuals – including seeking the Court's permission to conduct

such depositions after the close of fact discovery, because Defendants had been dilatory in

---

[1]  Although the Court initially appeared to chastise both sides on this issue, the basis of chastising Plaintiff – that we
had not provided Defendants an opportunity to review the photographs off the record, was clarified during the
conference as incorrect. (Ex. HH at 27-28.)

scheduling them.  (*See* Ex. N.)[2]

28.    Defendants refused meaningfully to explore ways of streamlining or agreeing to

an approach to the numerous depositions in the case, taking the hardline that Plaintiff could not

depose anyone if it resulted in more than ten depositions, even if that meant that Defendants

could call witnesses at trial who had been at the scene on May 8, 2005, whom Plaintiff had not

had an opportunity to depose.  The Court rejected the City's position.  Specifically, the Court

noted:

> In  essence, the City takes the remarkable position that the discovery rules permit
> it to have exclusive access to some witnesses until they appear on the stand at
> trial.  Such trial by ambush is diametrically opposed to the purpose of the Federal
> Rules of Civil Procedure.  Accordingly, I grant Vilkhu leave to depose any officer
> from the 103rd Precinct that was present at the scene of the incident, even if that
> results in the plaintiff taking more than a total of ten depositions.

(Ex. K at 4, Order of Jan. 27, 2007.)

29.    After that ruling, Defendants refused to agree to a method for reducing the

depositions that Plaintiff had to take of non-Defendant police officers who had been present at

York College on May 8, 2005.  Both before the Court's ruling on this issue and thereafter, I

attempted on several occasions through conversations with defense counsel to come up with a

method so that full depositions of each of these seven officers would not be necessary –

indicating, for example, that we would forego a deposition if defense counsel could represent to

us that an individual officer had not actually gone to the York College location on the evening of

May 8, 2005.  (*See* Ex. O.)  Later, I also told Mr. Larkin that we could forego a deposition if he

---

[2]  Although Defendants claimed they needed to take the depositions because Mr. Vilkhu had not checked off a box
on the authorizations allowing his doctors to discuss the case with the City informally, there was no evidence that
any doctor actually refused to speak with Defendants.  Indeed at least one doctor indicated at his deposition that he
had spoken to Mr. Larkin off the record.  Moreover, I offered Mr. Larkin the chance to speak with any doctor
informally and requested only the courtesy of being on the phone to listen.  As I indicated to Defendants, they could
quickly ask the questions they wanted to and then still insist on taking a deposition on the record if they determined
my representations about the extent of the doctor's knowledge and information was inaccurate.

could confirm that Defendants would not call the officer in his defense case, or could provide us

with a sworn statement from the officer stating that the officer had not observed any individual

being hit by the police or being treated by an ambulance that evening. After approximately three

such conversations, defense counsel abruptly refused to entertain the proposition further, stating

that it was just too difficult to come up with an agreement and easier to do the depositions.  At

that point, it became clear that based on the record so far, defense counsel had only been

interviewing the witnesses about the events of May 8, 2005 immediately prior to each deposition.

Given that record, and Defendants' constant delay in providing any information whatsoever, we

had no choice but to proceed with costly depositions.

30.     While neglecting their own disclosures, Defendants undertook extensive, time

consuming fishing expeditions concerning Plaintiff – seeking, for example, the production of

every single personal check Mr. Vilkhu had written, tax returns from multiple sources and

documents Mr. Vilkhu repeatedly represented were not in his possession. (*See* Ex. P, Letters

from M. Wang, May 1, 2007, April 24, 2007.) (*See also* Ex. Q at 19:5-25, Transcript of

Conference, May 1, 2007.)

31.     Defendants also engaged in additional unreasonable conduct during discovery,

including scheduling third party depositions at the last minute and then giving Plaintiff less than

one business day notice of the same and canceling another deposition of one of the potential

witness officers a half hour before the scheduled deposition, although Plaintiff's counsel was

ready to proceed and a court reporter was present.  (*See* Ex. R Voicemail Transcript of A. Larkin,

April 6, 2007; Letter from Kennisha Austin, April 5, 2007.)  The simple process of scheduling

depositions alone was made nearly impossible by Defendants.  From December 2006 to March

2007, I and Kennisha Austin sent Defendants no less than nine letters – and left multiple

additional voicemails – repeatedly requesting either that (i) Defendants provide dates certain for the depositions of their officers and/or York College security personnel or (ii) agree to a schedule for the numerous depositions that had to be take in the case. (*See* Ex. S, Letters from M. Wang and K. Austin.) For the most part, however, Defendants simply refused to schedule dates.  And because of Defendants' disregard, as Plaintiff repeatedly warned, fact discovery was not completed within the established schedule, requiring substantial, additional discovery after the deadline had expired.

32.    Even on the handful of occasions that Defendants accepted a suggested proposal by Plaintiff to streamline discovery, such agreements inevitably resulted in Defendants taking exceptions and attempting revisions after the agreement purported to be closed.  In one instance, where Defendants sought information concerning nearly a dozen acquaintances Plaintiff had mentioned in passing in his deposition – including fellow construction workers he knew only by first name – we attempted to curtail the fishing expedition by simply representing that Plaintiff would not call any of these individuals at trial.  Though Defendants initially agreed to this approach, they inevitably sought Court intervention when Plaintiff would not additionally agree to refuse to call any such person on his rebuttal case, regardless of whom Defendants were to call in their defense case.  Defendants eventually sought Court intervention on this issue and the Court rejected their argument. (DE 77.)

33.    In another notable example, on April 4, 2007, the parties reached an agreement regarding Defendants subpoenaing Plaintiff's wife, but on April 20, Defendants wrote to Plaintiff setting forth terms that went far beyond anything Plaintiff had ever agreed to previously.  (*See* Ex. T, Letters from and to A. Larkin, April 20 and 24, 2007.)

34.    Ultimately, the current, thirty-five page docket sheet of this action reflects only

some of the many areas in which Defendants refused to comply with basic rules, Orders of this

Court, took unreasonable positions or sought excessive discovery.  It does not reflect, for

example, the numerous letters we sent first to cajole, then to insist, and finally to threaten

seeking judicial intervention in order to obtain disclosures or dates for discovery that were due

Plaintiff.  Nor does it reflect our many efforts and communications to convince Defendants to

compromise and agree on some middle road before seeking judicial intervention.  In all, there

were approximately 200 written, substantive communications between Plaintiff and Defendants,

20 court conferences prior to trial, and approximately 30 substantive Court Orders.

35.     Defendants were also responsible for interminable – and often times unreasonable

– delay in the case.  As of result of Defendants' conduct, ranging from incessantly requesting

additional time to respond to and/or oppose various issues, requesting substantial additional

discovery after discovery had already closed, five different scheduling orders had to be issued in

this relatively simple and straightforward case.

**Post Discovery (April 2007 – May 2008): Defendants' Continued Discovery and Filing of
Unnecessary Motions**

36.     Even after fact discovery had closed on April 15, 2007, Defendants proceeded as

though it had not.  In addition to continuing to take depositions – the four treating physicians,

whom were never called at trial – more than a month after discovery had closed, Defendants then

sought leave to conduct a physical exam of Plaintiff pursuant to Fed. R. Civ. P. 35.

37.     We immediately recognized this as a tactic that would drive up the costs of this

case.  As I had repeatedly told defense counsel in conversations, Plaintiff anticipated calling just

one medical doctor at trial – an emergency medical physician who would opine on the

underlying medical records.  It was clear that Defendants would counter designate their

emergency doctor.  As I stated in conversations with defense counsel, this Rule 35 exam was not

only completely out of time and incredibly invasive, but meant that Plaintiff too would have to

hire a urologist to testify at trial.  We urged Defendants to forego the exam, but Defendants

insisted, applying to the Court for permission.

38.     Although the Court ultimately granted Defendants leave to conduct this exam –

over Plaintiff's objections on timeliness grounds and the further increase in the cost of litigating

this case that such an examination would create – the Court also noted Defendants' continuing

dilatory conduct in litigating this case,

> But the thing is, you could have put yourself in a position to learn all of this had
> you simply attended to your obligations on this case, as you have failed to do on
> ma[n]y occasions.  But had you done that, you'd be in a much better position and
> you wouldn't be asking me for this extraordinary relief.

(Ex. U at 13:22-14:2, Transcript of Conference, dated June 6, 2007.)

39.     After the ruling, it became clear that Defendants were designating not just one,

but *two* urologists – one to examine the Plaintiff and one to opine on his condition – and as such

the Rule 35 exam unquestionably required Plaintiff to hire a urologist to counter these witnesses

at trial.  Accordingly, Plaintiff attempted to eliminate any need for the examination and avoid

that cost.  On June 12, 2007, Plaintiff offered to withdraw his claim for current pain and

suffering, the precise reason offered by Defendants as the "good cause" for the Rule 35

examination.  (Ex. II, Letter from M. Wang, June 12, 2007.)  Defendants rejected this offer and

sought further court intervention to compel plaintiff to appear for the Rule 35 examination. (DE

85.)  After the Rule 35 examination, Plaintiff designated a urologist in rebuttal to Defendants'

new expert reports.   Predictably, although Defendants had been dilatory in seeking their Rule 35

exam, sought repeated extensions to file their own expert reports and ultimately attempted to

designate two urology experts, they did not hesitate to assert that Plaintiff should not be

permitted to designate a expert urology rebuttal. The Court quickly rejected that position.  (DE

119.)

40.     Moreover, during a conference in October 2007 – more than two months after
deadlines set by the scheduling Order for doing so had passed – Defendants announced their
intention to file a summary judgment motion.  Once again, the decision to make such a motion
seemed needlessly litigious and only guaranteed to increase the attorney time and costs in
proceeding with the case: there was simply no way that an excessive force case, where the
parties hotly disputed the core facts of the incident, was not going to trial, and motion practice
would not effect the basic presentation on liability or damages when all the claims fundamentally
arose out of the same set of facts.

41.     During the conference, the Court pressed Defendants for a basis for moving for
summary judgment in a case like this, and Defendants vaguely referenced law that allowed for
the dismissal of claims based on *de minimus* injury.  Ultimately, however, even Defendants
recognized that their motion had to be for partial summary judgment.  On the morning they filed
their motion, they noted that "[a]fter further consideration, we have decided to move on all but
the excessive force, and assault and battery, claims."  (Ex. U, Email from A. Larkin to M. Wang,
dated November 30, 2007.)

42.     After more than four months of extensive briefing, Defendants' summary
judgment motion was fully submitted on March 14, 2008.  (*See* DE 138.)  The lengthy briefing
schedule was due in large part to Defendants taking a full eight weeks to file reply papers –
longer than the period of time plaintiff took to oppose the motion in the first instance.  (See Ex.
W, Letter from K. Austin to Sifton, J., dated February 26, 2008.)  When Defendants ultimately
did file their reply papers, they did so inappropriately, raising new arguments in favor of granting
summary judgment for the first time.  (See Ex. X, Letter from K. Austin to Sifton, J., dated

March 26, 2008.)  This Court ultimately declined to consider Defendants' new arguments.  *See Vilkhu v. City of New York*, 06 Civ. 2095, 2008 WL 1991099, at *8 (E.D.N.Y. May 5, 2008).

43.     Precisely because Defendants' motion ignored entirely so many hotly contested issues, Plaintiff had no choice but to cull through the extensive record and set forth in his opposing Rule 56.1 Statement the numerous material areas of dispute, laboriously citing to the various parts of the record in support thereof.   On May 5, 2008, this Court issued an opinion, rejecting Defendants' arguments on every claim advanced but one.  While the Court acknowledged that it could have dismissed Defendants' motion on procedural grounds because "Defendants should have adhered to the scheduling order or requested an extension to file a motion for summary judgment," the Court elected not to do so.  *Id.* at  *4, fn.6.  And although the Court did dismiss Plaintiff's state law negligence claim, all of Plaintiff's other nine claims remained in the case against either the City of New York and/or the individual officer defendants.  Defendants' summary judgment motion's primary effect was simply to cause further delay and increase yet again the attorneys' fees and judicial energy spent on this obviously factually disputed case.

**Pre Trial and Trial (May 8, 2008 – October 14, 2008): Defendants' Misconduct Persists**

44.     In the immediate weeks preceding trial, Defendants' tactics fared no better.  Through depositions of Defendants' experts, Plaintiff quickly learned that Defendants had failed to provide all the disclosures required under Fed. R. Civ. P. 26.  Defendants' dilatory conduct was particularly egregious with respect to urologist Dr. Davis who identified approximately ten instances of prior expert testimony in the previous four years that had never been disclosed to Plaintiff as required under Fed. R. Civ. P. 26(a)(2)(B)(v).  Once again, we tried every method of obtaining this basic information in a timely manner.  I requested the information on the record at

the deposition, wrote several letters to Defendants repeatedly asking for it, and finally had no choice but to take the last resort of raising the issue with the Court in light of the fact that at that point trial was only three weeks away.  (*See* Ex. Y, Letter from M. Wang to J. Orenstein, June 23, 2008.)

45.     Magistrate Judge Orenstein conducted a conference with respect to this request immediately following the final pretrial conference with this Court on July 1, 2008.  After discovering the extent of Defendants' dilatory conduct, the Court sanctioned Defendants pursuant to Fed. R. Civ. P. 37, ordering them to produce transcripts of the approximately ten instances of prior testimony that Defendants had failed timely to disclose by the end of that week. (See DE 147.)

46.     Unfortunately, Magistrate Judge Orenstein's first sanctions Order would still not be enough to procure Defendants' immediate compliance.  Indeed, despite this Court's and the Magistrate Judge's multiple Orders with respect to this issue, including an Order by this Court rejecting yet another of Defendants' frivolous arguments – that they should not have to bear the burden of ordering any transcript that had yet to be printed out by a stenographer – Defendants ultimately produced the transcripts only in a desultory fashion over a period of two months, long after the strict deadline set by Magistrate Judge Orenstein had come and gone. (*See* Ex. Z, Letter from K. Austin to Sifton, J., dated September 10, 2008.)   In short, even sanctions from the Court resulted in only grudging and belated compliance by Defendants.

47.     Defendants' steadfast defiance of the basic rules and insistence on over-the-top tactics continued in the following weeks and during trial.  On June 26, 2008, Defendants served a surreptitious third-party trial subpoena without giving Plaintiff either a copy of the subpoena and/or proper notice as required under Fed. R. Civ. P. 45(b)(1).  (*See* Ex. AA, Letter from M.

Wang to A. Larkin, dated June 27, 2008.)

48.     Defendants also attempted to circumvent the Pretrial Order, making improper, last-minute additions, including seeking on the eve of trial to admit new documents that they had known about since the first days of discovery.  (*See* Ex. BB, Letter from M. Wang to Sifton, J., dated September 19, 2008.)  At trial, this Court ultimately rejected Defendants' efforts on this point.  (*See* Ex. CC at 247:3-20, Trial Tr., dated October 2, 2008.)

49.     During trial, Defendants reversed agreed-upon positions, in one instance suddenly objecting to a trial exhibit – in front of the jury – although they had expressly consented to it earlier that morning.  Defendants then made arguments that the Court had expressly addressed and rejected earlier.  The Court noted with frustration that Defendants were being "obstructive." (Ex. DD at 136:17-137:6; 138:3-139:9, Trial Tr., dated October 1, 2008.)

50.     Implementing their scorched-earth tactics at trial, Defendants called more than twice as many non-party witnesses in their case (ten) as plaintiff had called in his case-in-chief (four), bringing in the CCRB investigator, not just one, but two York College security officers, two additional police officers besides the Defendants, and two experts and the urologist who had examined Mr. Vilkhu, to name just a few.

51.     Even after trial, Defendants have fought unreasonably with Plaintiff: (1) over the form of judgment – rejecting even an alternative version proposed by Plaintiff that I explained over the telephone on November 7, 2008 to defense counsel was *precisely* sought to avoid contention and still allow both sides maximum flexibility to make whatever arguments each sought to on appeal or otherwise; and (2) over Plaintiff's suggestion that the parties conserve resources and attorney time by foregoing oral argument on Defendants' Rule 59 motion.  (Ex. LL, Email from M. Wang to A. Larkin referencing Nov. 7 telecon and enclosing alternative form

of judgment, Letter from K. Austin to Court regarding Judgment, Emails from/to M. Wang and A. Larkin regarding Oral Argument).

**Settlement Efforts**

52.     Throughout this enormously contentious litigation, Plaintiff repeatedly sought out Defendants to explore settlement.  Plaintiff understood that a settlement would not only eliminate the risk that a jury trial held for both sides, but would also be beneficial to Defendants as a means of cutting off the accrual of additional attorneys' fees and costs for which Defendants would ultimately be liable under 42 U.S.C. § 1988.  To that end, we approached Defendants repeatedly, exhorting them to have a meaningful discussion of settlement to avoid the accrual of additional attorneys' fees.

53.     Twice in March 2007 – after several depositions had occurred but before the onslaught of the main tasks of discovery – I approached Arthur Larkin to urge a settlement.  On March 15, 2007, I called Mr. Larkin on the telephone specifically to broach this topic, and on March 27, I again raised the issue during an in-person conversation with him.  Specifically, on both occasions, I pointed out that it appeared that significant attorney time was about to be spent by both sides preparing for and taking depositions, and that given that the proof of the case to date, including the contemporaneous 911 calls and the arrival of an ambulance at the scene, left little doubt that Plaintiff had been hit that night, settlement discussions made simple economic sense for Defendants.  Mr. Larkin made clear that he was absolutely convinced that Defendants' Rule 68 Offer would never be surpassed at trial and insisted on a hardline that Defendants would settle only for that.  Mr. Larkin also specifically referenced another case that had settled for $135,000 including attorneys' fees and expressly noted that the City would never pay anything even remotely approaching that amount for Mr. Vilkhu's case, including fees.

54.     In early October 2007, during settlement meetings on another case, I approached the head of Corporation Counsel's Special Federal Litigation Bureau and Mr. Larkin's supervisor, to point out that Defendants were acting irrationally in the instant action, refusing meaningfully to engage in settlement talks and undertaking scorched-earth tactics that were only continuing to drive up the fees and costs on the case.  The supervisor suggested Plaintiff put a demand to Defendants and also stated that if Defendants did not counter that demand, Plaintiff should call her directly.

55.     On October 18, 2007, Magistrate Judge Orenstein held a settlement conference with the parties, during which Plaintiff made a demand and repeatedly expressed willingness to negotiate and settle for some reasonable number.  Plaintiff also suggested that to the extent that attorneys' fees were a concern, he would agree to settling on a specified damages amount and then litigating or mediating the outstanding fees, but that continuing to litigate a case that contained a substantial risk of loss made little economic sense for Defendants.

56.     Magistrate Judge Orenstein pressed Defendants in the same manner – pointing out that even if they believed that they would win at trial – either entirely or by eliminating the risk of additional attorneys' fees based on their Rule 68 Offer – a rational economic actor would weigh the risk that a loss would result in a far higher number than was being offered to them, particularly given the ongoing accrual of fees, and would engage meaningfully in settlement discussions.  Defendants vigorously contested that premise, stating that they wished to have a trial.

57.     Ultimately, the Court asked both sides if they would be willing to meet in the middle point range between Defendants' hardline Rule 68 Offer plus fees accrued at the point of that offer and Plaintiff's current demand including then-current fees accrued.  I informed

Magistrate Judge Orenstein that we would be willing to explore that possibility, but Defendants plainly rejected it. Instead, Defendants filed a partial summary judgment motion, guaranteeing the additional increase of fees and time spent on litigating this case.

58. Prior to the decision on the summary judgment motion, I called the supervisor of the Special Federal Litigation Bureau, noting that Defendants had refused to counter Plaintiff's demand at the settlement conference and continued with scorched-earth tactics that only increased fees – including by filing a summary judgment motion on a case that unquestionably was going to trial. I expressed my client's willingness to negotiate his number or settle his compensatory damages and mediate fees, and the supervisor listened, but she never called back.

59. Even during and after trial, Plaintiff doggedly pursued Defendants, making every effort to stem the accrual of further fees and resolve the litigation reasonably. After Mr. Vilkhu's testimony was complete, the Court urged the parties to discuss settling the case. Plaintiff took that exhortation seriously. On October 3, 2008, Jonathan Abady – a partner at our firm who had had extensive dealings with Mr. Larkin in another action – approached Mr. Larkin invoking the Court's suggestion. Despite urging Defendants to act rationally and indicating a willingness to compromise, defense counsel adhered to his hardline position that Defendants would not settle for more than the mid five-figure range, inclusive of fees. He went on to elaborate that since he was sure Plaintiff's fees had to be in the six figures, he did not think settlement was feasible.

60. Near the close of trial, after receiving a note from the jury indicating that it was contemplating damages, the Court itself again urged settlement discussions, stating:

> I do urge in this last what I take to be very short time before the - - what I have to assume under the circumstances very short time before they reach a verdict – that both sides seriously consider settlement. There's been a lot of lawyering in this case, some very good; but ultimately it's not about lawyering. It's about people

and the clients' interests . . . of the plaintiff on the one hand and each Defendant considered separately on the other.  I've warned the Defendants and counsel that each individual Defendant and City all having to be represented here give consideration to such matters as not only the impact of damages but the impact of the jury's findings on the professional career of the Defendants, each of them, individual Defendants.  So, I hope that you - - we will have the time and that you will on both sides give serious consideration.

(Ex. EE at 1358:17-1359:7, Trial Tr., dated October 14, 2008.)  After responding to the jury's note, the Court again directly addressed defense counsel, urging him to consider settlement. ("Mr. Larkin: Your Honor, may I be heard on one issue?  The Court:  I suggest you confer with your clients.") (*Id.* at 1362:21-22.)  Once again, Defendants ignored the suggestion, as the Court itself observed.  ("All right.  Well, the record should reflect that since defense counsel are not taking my suggestion that they confer with clients, what is it you wanted to bring up?"(*Id.* at 1363:1-4.)

61.     Thereafter, the jury returned its verdict finding for Mr. Vilkhu and against the City of New York, Michael Hoehl and Adam Jangel, and awarding Plaintiff $20,000 in compensatory damages.

62.     Even since the verdict was rendered, Plaintiff has continued to try to end this litigation and stem the tide of fees.  On October 15, 2008, Jonathan Abady called the supervisor, suggesting that the parties settle the fees, but she ultimately stated that Defendants are unwilling to explore such settlement.  Instead, Defendants filed a Rule 59 motion for a new trial, necessitating more work on the case.  On January 15, 2009 and March 13, 2009, Mr. Abady called the supervisor two more times, offering in the latter conversation simply to agree in principle on a fee amount even if Defendants insisted on appealing the Rule 59 denial so as to avoid motion practice over the fees.  Again, the compromise was rejected.

63.     Given this extensive record, Defendants cannot possibly now claim that the hours

Plaintiff's counsel spent litigating this case are anything but reasonable.

**Plaintiff's Fees Accrued in this Action are Reasonable**

64.     As the partner in charge of this matter, I oversaw the staffing of associates, paralegals, and law clerks, as well as the work of other firm personnel and outside consultants necessary to appropriately and capably investigate the claims, litigate the case through discovery through trial, and oppose Defendants' various postjudgment motions.

65.     In accordance with ECBA's practice of utilizing the least expensive level of personnel where appropriate and consistent with the highest professional standards, ECBA utilized law clerks and paralegals whenever possible.

66.     The core legal team litigating this case consisted of Ms. Austin and myself, and indeed our hours account for 97% of the total amount of attorney hours expended on the matter. Messrs. Abady, Hecker, Maazel, and Ms. Netburn also contributed substantial time on various aspects of the case.  A more detailed account of all of the qualifications and experience of the various attorneys working on this matter is described below.    A summary of the hours expended is provided for convenience here:

| ATTORNEY | Hours | Rate | Amount |
|---|---|---|---|
| Mariann M. Wang | 1109.95 | $450.00 | $499,477.50 |
| Jonathan S. Abady | 32.45 | $525.00 | $17,036.25 |
| Eric Hecker | 9.50 | $450.00 | $4,275.00 |
| Ilann M. Maazel | 8.55 | $450.00 | $3,847.50 |
| Kennisha Austin | 1236.55 | $325.00 | $401,878.75 |
| Sarah Netburn | 13.90 | $400.00 | $5,560.00 |
|  | 2410.90 | Subtotal: | $932,075.00 |
| **PARALEGAL/LAW CLERK** |  |  |  |
| Jessica Buchanan | 35.05 | $125.00 | $4,381.25 |
| Joanna Jia | 17.45 | $125.00 | $ 2,181.25 |
| Janine Morna | 40.70 | $125.00 | $5,087.50 |
| Senna Riahi | 63.00 | $125.00 | $7,875.00 |
| Mary Kuder | 103.25 | $125.00 | $12,906.25 |
| Kim Cooper | 19.50 | $150.00 | $2,925.00 |

278.95        Subtotal:    $35,356.25

TOTAL:    $967,431.25

Because of the enormous number of hours expended on this matter, both I and Ms. Austin were

unable during the intense periods of litigating this case to take on paying hourly matters,

including commercial litigation that we routinely engage in.

67.      With respect to the hours expended on this action as detailed in Exhibit A (*see*

*infra* ¶ 2), significant amounts of time have been excluded in the exercise of billing discretion.

Through the course of this case, for example, there were several other, additional attorneys at

ECBA who also occasionally contributed substantive work, including by assisting in reviewing

briefs, consulting on litigation strategy issues, and assisting in mooting Ms. Austin and myself in

preparation for oral arguments and the trial's opening and summation.  Because each such

attorney's contribution amounted to only a handful of hours over the course of the three-year

litigation, however, all such time has been entirely excised from the bill.

68.      In addition, with respect to the remaining lawyers' entries, I have reviewed the

bill closely for duplicative or redundant time that two or more attorneys spent on one task.  As

indicated in a number of entries where "NO CHARGE" is noted on the bill, the firm is not

charging for over fifty hours of attorney time based on my review – even in instances which

arguably were not duplicative at all, such as where a key individual Defendant was being

deposed. *Compare e.g.,* Ex. A at p. 14 (Entry dated December 29, 2006, not charging for Ms.

Austin's time at the deposition of Defendant Michael Hoehl) *with Rozell v. Ross-Holst, et al.*,

576 F. Supp.2d 527, 541 (S.D.N.Y. 2008) (noting that it is not unreasonable for two attorneys to

attend proceedings that are critical to the litigation, such as depositions of key witnesses).

69.      All time spent by any lawyer traveling with respect to this action was reduced by

half, so that effectively only half the lawyer's normal rate is charged. *See e.g.,* Ex. A at 6 (Entry dated Sept. 11, 2006, noting that where I spent one hour traveling to and from a court conference, only half an hour of time was charged).

70.     When appropriate, ECBA utilized paralegal time in order to reduce fees, and our fee petition includes charges for that time. ECBA requests compensation of $125.00 per hour for paralegal work, which clients routinely and customarily pay. During the several years that ECBA has worked on this case, most of the paralegal work has been performed by Mary Kuder, Senna Riahi, Janine Morna and Jessica Buchanan. More than 60% of the paralegal/technical support fees requested in this matter are attributable to Mses. Kuder and Riahi. Ms. Kuder graduated with a B.A. from Yale University, and has had experience on at least a dozen other ECBA litigations in federal and state court. Ms. Riahi graduated with a B.A. from Hunter College and has had experience on at least two dozen other ECBA litigations in federal and state courts. The remainder of the paralegals for whom we are requesting fees range in experience from one to three years of federal court litigation experience.[3]

71.     ECBA also utilized law school students to work as law clerks when they were available. Plaintiff now seeks fees for the work performed by Kim Cooper, a law clerk who researched various issues, prepared research memoranda, drafted portions of submissions to the Court, and Bluebooked, cite-checked, and/or proofread briefs. At the time of her clerkship with ECBA, Ms. Cooper had just completed her second year at Pace Law School. For Ms. Cooper's work we request compensation of $150.00 per hour, which clients routinely and customarily pay.

·72.     I have reviewed our time records and the expense records, and certify that these records reflect work reasonably and necessarily performed, and expenses reasonably and

---

[3]  Ms. Buchanan graduated with a B.A. from Columbia University, Joanna Jia graduated with a B.A. from Wesleyan University, and Janine Morna graduated with a B.A. from Yale University.

necessarily incurred in connection with the litigation of this matter.

**The Costs Accrued Are Reasonable as Well**

73.     Regarding costs, ECBA has incurred $100,039.76 in costs. Attached as Exhibit JJ

are a detailed listing of the costs accrued in this matter through February 28, 2009.  The costs are

of the type normally charged to clients of ECBA.  The costs and expenses identified in Exhibit JJ

are reflected in the accounting books and records ECBA maintains in the ordinary course of

business.  These books and records are prepared from bills from vendors, receipts and expense

vouchers and check records.  Copies of those individual records, showing full details of charges

and expenses incurred in this action, are too voluminous to attach to this declaration.  We will

make them available, if requested by the Court.  The out-of-pocket costs incurred by ECBA to

prosecute this case were for customary litigation expenses like subpoenas, research, court

reporters, expert and consultancy fees, messenger services, travel and meals.

74.     The following is a simplified chart of the actual fees and costs for which ECBA is

seeking reimbursement:

| Category | Amount |
|---|---|
| Witness Fees | $ 90.00 |
| Subpoenas | $ 55.00 |
| Trial Materials | $ 1,854.83 |
| Translation | $ 3,250.00 |
| Legal Research - Database Access | $ 6,268.21 |
| Document Retrieval & Process Server | $ 2,089.64 |
| Court Reporters | $ 32,606.26 |
| Consultant/Expert | $ 41,818.06 |
| Medical Records Fees | $ 102.81 |
| Messenger | $ 1,291.84 |
| Court Fees | $ 350.00 |
| Fedex | $ 584.11 |
| Postage | $ 89.33 |

| Secretarial Overtime | $ | 145.60 |
| Photocopies | $ | 6,681.86 |
| Travel | $ | 2,173.92 |
| Meals | $ | 588.29 |
| Total: | $ | 100,039.76 |

## ECBA'S Hourly Rates Are Reasonable

75.     ECBA is a fourteen-lawyer firm located in mid-town Manhattan which specializes in civil rights litigation.   All of the attorneys from ECBA who worked on this case have extensive experience litigating Section 1983 cases in widely ranging contexts, and ECBA is known to have a high degree of success with our cases against the City for police and corrections officers' brutality.

76.     Just some recent examples include: *Kunstler v. City of New York*, 04 Civ. 1145 (S.D.N.Y.)(Sweet, J.) (representing over 50 anti-war protestors falsely arrested and rounded up while protesting the Carlyle Group); *Wise v. City of New York*, 05 Civ. 5442 (S.D.N.Y.) (Scheindlin, J.) (representing a class of mostly homeless individuals falsely arrested over several years under a N.Y. Penal Law provision that had long ago been declared unconstitutional); *McBean v. City of New York*, 02 Civ. 05426 (S.D.N.Y.) (Lynch, J.)(representing a class of hundreds of thousands of pre-trial detainees subjected to a blanket strip search policy that the City had claimed it had suspended years before based on prior litigation); *O'Day, et al. v. Nassau County, et al.,* 99 Civ. 2844 (E.D.N.Y.)(Hurley, J.) (representing class of thousands of pre-trial detains subjected to blanket strip search policy); *Williams v. City of New York*, 07 Civ. 4120 (SLT) (CLP) (representing two brothers that were racially profiled, assaulted, and unlawfully detained by the NYPD); *Hughes v. City of New York*, 07-cv-9677 (DLC)(KNF) (excessive force case where young woman lost four of her permanent teeth after being punched in the mouth by a NYPD officer); *A.P. et al. v. City of New York,* 08 Civ. 2409 (S.D.N.Y.)(Koeltl) (false arrest by

NYPD of three Mexican-American kids during a sweep); *Brujan v. City of New York,* 06 Civ. 2154 (S.D.N.Y.)(TPG)(HBP) (excessive force by NYPD); *Cuadrado v. City of New York , et al.,* 07 Civ. 1447  (S.D.N.Y.) (Baer, J.)  (excessive force by New York City Department of Correction officers); *Siler v. City of New York*, 08 Civ. 8359 (S.D.N.Y.) (McMahon, J.) (excessive force by NYPD); *Hardy v. Fischer*, No. 08 Civ. 2460 (S.D.N.Y.) (Stein, J.) (representing putative class of thousands of individuals wrongfully subjected to post-release supervision); *Diaz and Smith v. City of New York*, 08 Civ. 4391 (S.D.N.Y.) (Chin, J.) (representing two inmates who were assaulted at Rikers Island); *Aviles v. City of New York*, O4 Civ. 02792 (S.D.N.Y.) (Preska, J.) (excessive force by NYPD), *Schildhorn v. City of New York*, 07 Civ. 1419 (S.D.N.Y.) (Jones, J.) (excessive force by NYPD) *Jadamec v. City of New York*, et al., 08-Civ.-2032 (E.D.N.Y.) (Irizarry, J.) (false arrest by NYPD); *Livermore v. City of New York*, et al., 08-CV-4442 (Buchwald, J.) (deliberate indifference to medical needs and excessive force at Rikers Island, resulting in plaintiff's husband's death); *Shuford v. City of New York*, et al., 09-CV-0945 (Castel, J.) (excessive force by Department of Corrections, including sanctioning inmate-on-inmate violence); *Youngblood v. City of New York, et al., 08-CV-5982* (Buchwald, J.) (excessive force by Department of Corrections); *Snoussi v. Bivona*, et al., 05-CV-3133 (Bloom, M.J.) (appointed by Court for limited appearance on behalf of *pro se* plaintiff to identify federal agents who used excessive force); *Casale, et al., v. Kelly, et al*., 08-CV-02173 (Scheindlin, J.) (representing a putative class of individuals falsely arrested over many years under N.Y. Penal Law provisions that had been declared unconstitutional by the New York Court of Appeals).

77.    ECBA's attorneys all have enormous individual achievements before joining the firm – nearly all of them have federal court clerkships as well as extensive experience litigating

at or with premier public interest organizations that are at the forefront of civil rights battles. The detailed experience of the individual attorneys who worked on this case is set forth below.

### Mariann Meier Wang

78.     I received my A.B. from Harvard College in 1990 and my J.D. degree from Columbia University School of Law in 1996, where I was a James Kent Scholar for outstanding academic performance, received the Jane Marks Murphy Prize for excellence in clinical offerings and promise of a public interest career, and was on the *Human Rights Law Review*.

79.     From August 1996 to August 1997 I served as a law clerk to the Honorable Sterling Johnson, Jr., in the Eastern District of New York.

80.     I was a litigation associate at the law firm Paul Weiss Rifkind Wharton & Garrison in New York from 1997 to 1999.  Although I was a junior associate at a large firm, I was able to obtain trial experience, including by examining and cross-examining witnesses in a range of cases, including a trademark infringement action in the Southern District of Texas, and a commercial dispute that was litigated in state court in Chicago.  I also actively litigated a number of *pro bono* cases, including a class action on behalf of lesbian, gay, bisexual and transgendered foster children who were mistreated in New York City's child welfare system.

81.     For approximately two years, I was employed as a staff attorney by the American Civil Liberties Union ("ACLU") Reproductive Freedom Project, where I litigated all aspects of constitutional and other challenges to laws restricting reproductive rights and access to reproductive health care in federal and state courts throughout the country.  Theses cases included a constitutional challenge to Georgia's restrictions on Medicaid funding for abortions, New Jersey's parental notification law, Colorado's parental notification law, Florida's sexual history notification law, as well as prisoners' access to abortion in various states.

82.     For two years, I served as the Director of the Equality and Freedom of Expression Programs at Interights, The International Centre for the Legal Protection of Human Rights in London, England.  While there, I developed and undertook strategic litigation in international and regional courts to advance standards of protection under international and regional human rights law.  I also provided litigation assistance on international and comparative law to lawyers and victims in domestic cases throughout Africa, South Asia, the Caribbean, Central and Eastern Europe and the former Soviet Union.  Finally, I spoke and taught extensively around the world conducting trainings of both lawyers and judges to educate them on international and comparative standards and strategic techniques to conduct impact litigation.

83.     I joined ECBA as an associate in June 2003 and became partner in January 2006. My work at the firm includes investigating, instituting, managing, and litigating civil rights and commercial cases, including class actions and individual claims.  I have served as lead counsel on many civil rights cases over the years, including without limitation a number against the City of New York such as: *McBean v. City of New York*, 02 Civ. 05426 (S.D.N.Y.) (Lynch, J.); *Brujan v. City of New York,* 06 Civ. 2154 (S.D.N.Y.); *Cuadrado v. City of New York , et al.,* 07 Civ. 1447  (S.D.N.Y.) (Baer, J.); and *Concepcion v. City of New York, at al.*, 03 Civ. 7141(S.D.N.Y.).  Our civil rights cases include constitutional claims under Section 1983, as well as claims under federal, state and city human rights laws. Specifically, cases I have worked on include claims concerning unreasonable searches and seizures and excessive force in police misconduct and prisoners' rights context, unlawful takings, First Amendment and Equal Protection violations, fair housing violations, employment discrimination, and disability rights.

84.     Many of my civil rights cases are litigated before the Southern and Eastern Districts of New York.

85.     I serve as class counsel or co-class counsel in several litigations, including in *McBean v. City of New York*, 02 Civ. 05426 (S.D.N.Y.) (representing hundreds of thousands of pre-trial detainees); *O'Day, et al. v. Nassau County, et al.,* 99 Civ. 2844 (E.D.N.Y.) (Hurley, J.) (representing thousands of pre-trial detainees); and *Fernandez, et al. v. Crystal Restoration Enterprises, Inc., et al.,* Index No.: 08-601093 (N.Y. Sup. Ct.) (representing hundreds of low-wage immigrant workers who were not paid properly for their labor in cleaning up Ground Zero). I also manage associates and paralegals, recruitment and other aspects of firm administration.

86.     I serve currently on the board of the National Employment Lawyers Association – New York (NELA-NY), an organization dedicated to supporting the development of employment law and employment law practitioners.  I have lectured and written repeatedly in the areas of Section 1983 and employment law, including recently having served on a Section 1983 panel directed at federal law clerks, organized by the Federal Bar Council.  I have also published a number of articles, including *Section 1983: Tips for Beginners* (NELA NY Spring Newsletter, 2008); *The European Convention on Human Rights and Media Law*, with the Rt. Hon. Lord Lester of Herne Hill QC, in The Yearbook of Copyright & Media Law, Oxford University Press 2002, and *The International Tribunal for Rwanda: Opportunities for Clarification, Opportunities for Impact*, 27 Colum. Hum. Rts. L. Rev. 177 (1995) (Note).

87.     In short, I have been practicing since 1996 and have focused my practice on civil rights law.  I have handled numerous such cases at all stages, from intake to initiation, through jury and bench trials and on appeal.  My current hourly rate is $450 per hour which clients routinely and customarily pay, including clients who pay my hourly rate to litigate their civil rights cases.  A resume and synopsis of my experience is attached as part of Exhibit KK.

88.     Based on the prevailing rates for attorneys with more than a dozen years of practice with the requisite experience in federal litigation and civil rights cases, ECBA seeks a rate of $450 per hour for my work.

89.     This rate is consistent with the rates awarded to civil rights litigators of comparable experience in New York City, where ECBA is located.

90.     ECBA's paying clients are routinely willing to pay and do pay the rates charged by ECBA lawyers for work performed on cases within and outside of the Southern and Eastern Districts of New York. ECBA is unusual among New York City law firms in that certain clients retain us and pay us to litigate their civil rights actions.  I and Ms. Austin have both worked on cases in which clients retained us and paid us on an hourly basis to pursue their civil rights claims.

91.     ECBA's rates are consistent with the rates awarded to civil rights litigators of comparable experience in New York City, where ECBA is located.

92.     In *Wise v. City of New York*, 05 Civ. 5442, 2008 WL 482399, at *7 (S.D.N.Y. Feb. 21, 2008), in concluding our hourly rates were reasonable, the court noted that ECBA is "a preeminent civil rights law firm" in New York City and further stated, "[t]his Court may also take judicial notice of ECBA's high reputation . . . finding it to be one of the most competent, successful, and reputable civil rights firms practicing in this Court." *Id.* at *7 & n. 12.  The court when on to state:

> Brinckerhoff and Rosenfeld [ECBA attorneys] are experienced and very capable members of a prestigious civil rights law firm that maintains expensive office space and are, therefore, more like members of a large New York City law firm than they are like members of a nonprofit organization or a two to three-person obscure law firm.

*Id.* at *8.

### Kennisha A. Austin

93.     Kennisha A. Austin received her J.D. degree from Columbia University School of in 2005.

94.     After graduating from law school, Ms. Austin clerked for the Honorable Damon J. Keith on the Sixth Circuit Court of Appeals from 2005 through 2006.

95.     In September 2006, Ms. Austin joined ECBA as an associate.  In the two-and-a-half years she has been with the firm, Ms. Austin has represented both individual plaintiffs in federal court who have been the victim of police abuse, as well as organizations, such as 100 Black Men of Long Island Development Group, who paid her hourly rate for work she performed in bringing their civil rights case.  Ms. Austin has also represented individuals on their race and gender discrimination claims in employment.  Ms. Austin is also currently counsel in a federal death penalty case.  She has performed all aspects of litigation, including drafting and arguing motions, taking and defending depositions, negotiating with opposing counsel, and representing clients at administrative hearings.

96.     She has guest lectured at Columbia University School of Law on multiple occasions on civil rights and education issues.  Last summer she also received an adjunct appointment at Columbia University Teachers College, where she co-taught a course to 46 graduate students focused on civil rights issues in education.

97.     During law school, Ms. Austin also worked at numerous civil rights organizations, including the South African Human Rights Commission in Cape Town, South Africa; the NAACP Legal Defense and Educational Fund, the Civil Rights Bureau of the New York State Attorney General's Office, New York Lawyers for the Public Interest, and Cochran

Neufeld & Scheck LLP.   Ms. Austin's resume is attached as part of Exhibit KK to this declaration.

98.      Based on the prevailing rates for attorneys of Ms. Austin's experience as with the requisite experience in federal litigation and civil rights cases, ECBA seeks a rate of $325 per hour for her work.  This is the current hourly rate which ECBA's clients routinely and customarily pay for the work of fourth-year associates.

99.      This rate is consistent with the rates awarded to civil rights litigators of comparable experience in New York City, where ECBA is located.

### Jonathan S. Abady

100.      Jonathan S. Abady, a partner at ECBA, received his J.D. degree from New York University School of Law in 1990.  While at NYU School of Law, Mr. Abady was Root-Tilden-Snow Scholar and won Best Oralist in the Orison S. Marden Moot Court Competition.  Mr. Abady was also Colloquium Editor for the Review of Law & Social Change and a member of the Criminal Defense Clinic.

101.      Mr. Abady began his legal career as a trial lawyer, and was then a supervising attorney with the Neighborhood Defender Service of Harlem, a national demonstration project in New York City that provides criminal defense services to indigent residents of the Harlem community.   Prior to joining ECBA, Mr. Abady worked as an associate at the law firm of Beldock Levine & Hoffman LLP.  In this capacity, he worked on a wide array of civil rights cases, including many against the City of New York.

102.      In 1998, Mr. Abady joined ECBA as a partner.  He has a diverse trial and litigation practice, with extensive experience in both the state and federal courts.  Mr. Abady successfully litigated and argued *Gasperini v. The Center for Humanities*, 518 U.S. 415 (1996) in

the United States Supreme Court, a seminal case in Seventh Amendment jurisprudence now featured in law school case books throughout the country.

103.    Mr. Abady also has substantial experience in class action and multi-party litigation. Along with other members of the firm, he represents family members of victims who died in the 1988 bombing of Pan Am flight 103 in a historic lawsuit that resulted in a $2.7 billion settlement with the government of Libya. From 1997 to 2003, Mr. Abady was co-counsel to the Republic of Ecuador in international environmental litigation aimed at securing relief for contamination of the Amazon rain forest. Mr. Abady was one of the lead lawyers in *Ingles v. Toro,* 97 Civ. 3762 (S.D.N.Y), a large class action lawsuit which established major reform in the jail system at Rikers Island in New York City.

104.    In the area of civil rights, Mr. Abady has represented numerous plaintiffs in wrongful death actions, police misconduct cases, First Amendment litigation, and voting rights cases. In 2000, Mr. Abady was a member of the team of lawyers who litigated voting irregularities in Florida in the Bush-Gore Presidential election.  In 2008, during the most recent presidential election, Mr. Abady also led a team of ECBA lawyers in a landmark voting rights case in Pennsylvania, obtaining a preliminary injunction – that has since been made permanent – requiring that paper ballots be made available to voters in any precinct where 50% or more of the electronic voting machines fail.

105.    In 2008, Mr. Abady was named in The Best Lawyers in America as one of New York's top attorneys in the area of civil rights law. *See* www.bestlawyers.com.   Mr. Abady's resume is attached as part of Exhibit KK to this declaration.

106.    Based on the prevailing rates for attorneys with nineteen-year experience with the requisite experience in federal litigation and civil rights cases, ECBA seeks a rate of $525 per

hour for Mr. Abady.  This is Mr. Abady's current hourly rate which ECBA's clients routinely and customarily pay.

107.    This rate is consistent with the rates awarded to civil rights litigators of comparable experience in New York City, where ECBA is located.

108.    As set forth in the billing records attached as Exhibit A, Mr. Abady expended more than thirty hours on this case, assisting in certain discrete tasks such as attempting to advance settlement discussions, assisting in trial preparation including providing strategic trial advice and assistance during *voir dire*.

### Eric Hecker

109.    Eric Hecker, a partner in the firm, received his J.D. degree from University of Michigan Law School, *magna cum laude*, in 1997, where he was also awarded the Order of the Coif.  Mr. Hecker was also Articles Editor for the Michigan Law Review

110.    After law school, Mr. Hecker clerked for three federal judges: David Tatel of the D.C. Circuit, Thelton Henderson of the Northern District of California, and the late Constance Baker Motley of the Southern District of New York.  Prior to joining ECBA, Mr. Hecker worked at Kirkland & Ellis in New York.

111.    In 2002, Mr. Hecker joined the firm as an associate and in 2006 he became a partner of the firm.

112.    Mr. Hecker's practice focuses on civil rights litigation, including First Amendment, children's rights, election law, police misconduct, prisoners' rights, and employment discrimination, and on commercial litigation, including business torts, partnership disputes, and intellectual property. Mr. Hecker also teaches a course in election law at Cardozo Law School.

113.    Some of Mr. Hecker's representative cases include: *Fuel Outdoor v. City of New York and Fuel Outdoor v. City of San Francisco* (Represents a national outdoor advertising company in First Amendment challenges to sign restrictions in New York City and San Francisco); *Estate of Hailey Gonzalez v. City of New York* (Represents the estate of a two-year-old girl who was murdered by her mother's boyfriend while under the supervision of the City's foster care agency in a case alleging that the City was grossly negligent in failing to protect her); *Estate of Emil Mann v. Walder* (Represents the family of Emil Mann, an unarmed member of the Ramapough Lenape Indian Nation who was fatally shot by an officer of the New Jersey State Park Police while attending a family barbeque, in a civil rights and wrongful death action); *Riverside Syndicate, Inc. v. Monroe* (Represented rent-stabilized tenants in an appeal before the New York Court of Appeals in which the landlord sought to void a prior consent judgment on the ground that the tenants' waiver of certain of their rights under the rent-stabilization laws violated public policy); *K.J. v. State of New Jersey* (Represented three New Jersey foster children who were systematically starved by their foster and adoptive parents over a period of years in a civil rights action against the State and the case workers who failed to protect them); *Rodriguez v. Pataki* (Represented a coalition of voters in an Equal Protection Clause and Voting Rights Act challenge to the 2002 redistricting of the New York State Senate districts.).

114.    Mr. Hecker's resume is attached as part of Exhibit KK to this declaration.

115.    Based on the prevailing rates for attorneys of Mr. Hecker's experience while working at ECBA as a twelfth-year attorney with the requisite experience in federal litigation and civil rights cases, ECBA seeks a rate of $450 per hour for Mr. Hecker's work. This is the current hourly rate which ECBA's clients routinely and customarily pay for the work of partners

with a dozen years of experience. This rate is consistent with the rates awarded to civil rights litigators of comparable experience in New York City, where ECBA is located.

116.    As set forth in the billing records attached as Exhibit A, we seek fees for nearly ten hours of Mr. Hecker's time expended in this action. Mr. Hecker's time was spent preparing for and taking the deposition of the Emergency Medical Technician who attended to Plaintiff on the night of the incident and whose deposition transcript was extensively designated by both parties and read into the record at the trial when the witness was unavailable. Mr. Hecker assisted on the case and conducted this deposition of a key witness at a time when I was out of the country and unable to take it myself.

### Sarah Netburn

117.    Sarah Netburn received her J.D. from the UCLA School of Law in 2001 where she completed its Program in Public Interest Law and Policy. She graduated *summa cum laude* and was elected to the Order of the Coif.

118.    After law school, Ms. Netburn clerked on the United States Court of Appeals for the Ninth Circuit for the Honorable Harry Pregerson.

119.    In 2002, Ms. Netburn joined the firm as an associate. She became a partner in 2009.

120.    In her practice, Ms. Netburn is responsible for discovery, motion practice, trial preparation, conduct of hearings and trials, and research and writing of trial and appellate briefs in a wide variety of cases.

121.    Some of Ms. Netburn's representative cases include: *Ingles v. Toro* (counsel for class of thousands of individuals detained in New York City jails; obtained landmark settlement in case alleging municipal pattern and practice in which Department of Corrections officers use

excessive force to control and punish inmates; settlement included significant changes in training of DOC staff, improved investigations process, increased discipline of officers, and $2.2 million in damages for 22 class representatives); *Kunstler v. City of New York* (trial counsel for 52 plaintiffs who were falsely arrested at peaceful anti-war demonstration; conducted dozens of depositions, including of senior members of New York City Police Department; obtained numerous successful discovery rulings, including important ruling related to discoverability of civil rights plaintiffs' psychological records); *Marijuana Policy Project* (trial and appellate counsel for non-profit organization in numerous ballot access cases, including: obtained preliminary and permanent injunctive relief in cases challenging Nevada's initiative petition process on First Amendment and Equal Protection grounds; successfully challenged South Dakota's ballot explanation of MPP initiative); *Rice v. City of New York* (counsel to three individuals who were severely beaten by New York City Corrections officers for refusing to participate in staff-organized inmate-on-inmate fights; obtained $1.2 million for plaintiffs); *Hurst v. Libya* (counsel for families who lost loved ones in the bombing of Pan Am Flight 103 over Lockerbie, Scotland; successfully defended against Libya's motion to dismiss; won summary judgment against Libyan agent).

122.   The Legal Aid Society awarded Ms. Netburn with its 2004 and 2005 Pro Bono Publico Awards. She has also served as a Member of the Civil Rights Committee for the Association of the Bar of the City of New York.

123.   Ms. Netburn's resume is attached as part of Exhibit KK to this declaration.

124.   Based on the prevailing rates for attorneys of Ms. Netburn's experience while working at ECBA as an attorney with eight of experience and the requisite experience in federal litigation and civil rights cases, ECBA seeks a rate of $400 per hour.  This is Ms. Netburn's

current hourly rate which ECBA's clients routinely and customarily pay. This rate is consistent with the rates awarded to civil rights litigators of comparable experience in New York City, where ECBA is located.

125.    As set forth in the billing records attached as Exhibit A, we seek fees for nearly fourteen hours of Ms. Netburn's time expended in this matter.    Ms. Netburn assisted at key times throughout the litigation, including by providing assistance with discrete tasks such as researching and drafting a section of the opposition papers on summary judgment, and assisting in certain pre-trial tasks.

### Ilann Maazel

126.    Mr. Ilann Margalit Maazel received his J.D. degree from the University of Michigan, J.D., *magna cum laude*, in 1997 and was elected to the Order of the Coif.  During law school, Mr. Maazel worked at Paul, Weiss, Rifkind, Wharton & Garrison and at the Federal Defenders in the Eastern District of New York.

127.    After law school, Mr. Maazel clerked for the Hon. John M. Walker on the United States Court of Appeals for the Second Circuit.

128.    In 1998, Mr. Maazel joined the firm as an associate and became a partner in 2004.

129.    Mr. Maazel has a diverse trial and appellate practice, with extensive experience in both federal and state court.  Mr. Maazel's civil rights docket focuses upon police misconduct, free speech, election, education, employment discrimination, wrongful death, and class action litigation. He also represents a number of institutions and individuals in complex commercial and intellectual property disputes, and counsels high-level executives in compensation and employment matters. He has argued, and won, six appeals in federal and state court.

130.     Mr. Maazel's clients have included Martha Stewart, Friends of the High Line, the New York City Council, New York gubernatorial candidate Tom Golisano, the City of Mount Vernon, and a diverse array of commercial and civil rights clients. He has served as class counsel or co-counsel to a putative class of tens of millions of Americans subjected to illegal surveillance by the federal government, to a class of hundreds of disabled preschool children in a suit against the New York City and State Departments of Education, and to a class of thousands of inmates in New York City prisons in a suit against the New York City Department of Corrections.

131.     Mr. Maazel is also a columnist for the New York Law Journal, where he regularly writes and lectures on civil rights, First Amendment, education, and election law issues, and is a frequent commentator on civil rights issues in the national media.  In addition, Mr. Maazel has also been published in a number of other publications, including: *Wrongful Death Actions Under Section 1983*, 19 Touro Law Review 707 (2003) (excerpt from the Practicing Law Institute's 18th Annual Section 1983 Civil Rights Litigation Program) and *Why Civil Rights Lawsuits Do Not Deter Police Misconduct: The Conundrum of Indemnification and a Proposed Solution*, 28 Fordham Urban Law Journal 587 (2000) (with Richard D. Emery).

132.     Mr. Maazel is a recipient of the Legal Aid Society's 2004 and 2005 Pro Bono Publico Awards, a 2001-02 recipient of a Coro Fellowship, Leadership New York, and received an Echoing Green Public Service Fellowship, awarded to "outstanding individuals who are committed to public service work."

133.     Mr. Maazel's biography is attached as part of Exhibit KK to this declaration.

134.     Based on the prevailing rates for attorneys of Mr. Maazel's experience, ECBA seeks a rate of $450 per hour.  This is Mr. Maazel's current hourly rate which ECBA's clients

routinely and customarily pay.  This rate is consistent with the rates awarded to civil rights litigators of comparable experience in New York City, where ECBA is located.

135.    As set forth in the billing records attached as Exhibit A, we seek fees for less than nine hours of Mr. Maazel's time expended in this matter.  Mr. Maazel assisted with the discrete task of drafting Plaintiff's proposed jury instructions while I and Kennisha Austin prepared witnesses and our cross-examinations for trial, as well as mooting us in preparation for trial.

## CONCLUSION

136.    In sum, ECBA requests a fee award of $967,431.25 plus $100,039.76 in costs, plus interest to be determined for costs.  (*See* Exhibits A and JJ.)  Plaintiff will submit a supplemental fee application for time spent on post-trial motion practice, including this fee application, as well as any costs that were paid after February 28, 2009.

Dated: April 3, 2009
       New York, New York                          Mariann Meier Wang