UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------X

Harwinder Vilkhu,                                    06-CV-2095
                                  Plaintiff,         (CPS)(JO)

          - against -

The City of New York, Police Officer and/ or         MEMORANDUM
Sergeant Hoehl, Police Officer and/ or               OPINION &
James Long, Police Officers Jeffrey Cline,           ORDER
Stephen Samartino, Adam Jangel, and Police
Officers John/Jane Does # 1-10,

                                  Defendants.

--------------------------------------------X

SIFTON, Senior Judge.

        Plaintiff Harwinder Vilkhu ("Vilkhu") commenced this action

on May 5, 2006 against defendants the City of New York ("City"),

Police Officer and/or Sergeant Hoehl ("Hoehl"), and Adam Jangel

("Jangel") (collectively, "defendants"),[1] alleging that

defendants violated his rights under 42 U.S.C. §§ 1983, 1981 and

the New York State Constitution, and raising state tort claims.

A jury trial took place between September 29, 2008 and October

14, 2008.  The jury returned a verdict in plaintiff's favor on

his federal and state excessive force and battery claims and

awarded him $20,000 in compensatory damages.  On March 3, 2009, I

denied defendants' motion for a new trial.

        Presently before this Court is plaintiff's motion for an

_____

        [1] On September 8, 2008, the parties stipulated to the dismissal of all
claims against defendant Police Officers James Long ("Long"), Jeffrey Cline
("Cline"), and Stephen Samartino ("Samartino") with prejudice.

award of attorney's fees, costs and interest pursuant to 42
U.S.C. § 1988. For the reasons set forth below, I conclude that
plaintiff is entitled to attorneys fees, costs and interest in
the total amount of $729,679.76. What follows sets forth the
findings of fact and conclusions of law on which this
determination is based, as required by Rule 58 of the Federal
Rules of Civil Procedure. Fed. R. Civ. P. 58(a)(1).

## BACKGROUND

Familiarity with this Court's earlier decisions, findings
and conclusions is assumed. *See Vilkhu v. City of N.Y.*, No.
06-CV-2095, 2008 WL 1991099 (E.D.N.Y. May 05, 2008) (granting in
part and denying in part defendants' motion for partial summary
judgment); *Vilkhu v. City of N.Y.*, No. 06-CV-2095, 2009 WL 537495
(E.D.N.Y. Mar. 3, 2009) (denying defendants' motion for a new
trial).

## DISCUSSION

I.  <u>Standard Governing a Motion for Attorney's Fees and Costs</u>

In a civil rights case, attorney's fees are available to the
prevailing party under 42 U.S.C. § 1988(b). That statute
provides as follows:  "In any action or proceeding to enforce a
provision of section[] . . . 1983 . . . of this title, . . . the
court, in its discretion, may allow the prevailing party, other
than the United States, a reasonable attorney's fee as part of
the costs[.]" *See Roberson v. Giuliani*, 346 F.3d 75, 78 (2d Cir.

2003) ("42 U.S.C. § 1988 grants the district court explicit authority to award attorney's fees to a 'prevailing party' in an action brought under § 1983.").

"Generally, the Supreme Court has given a 'generous formulation' to the term prevailing party, stating that plaintiffs may be entitled to attorney's fees 'if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.'" *Roberson*, 346 F.3d at 79 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). Here, plaintiff prevailed on his excessive force and battery claims, obtained entry of judgment against defendants, and damages in the amount of $20,000. Accordingly, plaintiff qualifies as a prevailing party for the purposes of awarding attorney's fees and costs.

In calculating reasonable attorney's fees, courts in the Second Circuit are guided by the Circuit's recent opinion in *Arbor Hill Citizens Neighborhood Association v. County of Albany*, 522 F.3d 182 (2d Cir. 2008). In *Arbor Hill*, the Second Circuit moved away from the traditional use of the "lodestar" method of calculation and advised that, in determining what it termed a "presumptively reasonable fee," district courts should "bear in mind all of the case-specific variables that we and other courts have identified as relevant to the reasonableness of attorney's fees in setting a reasonable hourly rate," which it defined as

"the rate a paying client would be willing to pay." *Id.* Thus, in the wake of *Arbor Hill*, "the presumptively reasonable fee is calculated by setting a reasonable hourly rate that reflects what rate a paying client would be willing to pay, and multiplying that rate by the number of hours reasonably expended litigating the case." *Estrella v. P.R. Painting Corp.*, 596 F.Supp.2d 723, 725 (E.D.N.Y. 2009) (quoting *Joe Hand Promotions, Inc. v. Martinez*, No. 07 CV 6907, 2008 WL 4619855, at *7 (S.D.N.Y. Oct. 17, 2008). After calculation of the presumptively reasonable fee, the court must then consider whether an upward or downward adjustment of the fee is warranted based on factors such as the extent of plaintiff's success in the litigation. *See Hensley*, 461 U.S. at 434 & n.9.[2]

In civil rights cases, however, there is a strong presumption that the "lodestar figure" (or the "presumptively reasonable fee" in *Arbor Hill*'s terminology) represents a reasonable fee, because "if private citizens are to be able to assert their civil rights, and if those who violate the Nation's

---

[2] In *Hensley*, the Supreme Court noted that district courts could consider factors other than the degree of plaintiff's success, such as the factors identified by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-719 (5th Cir. 1974), in determining whether to reduce the fee as calculated. However, it cautioned that district courts "should note that many of these factors usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate." *Hensley*, 461 U.S. at 434 n.9. Under the Second Circuit's framework as set forth in *Arbor Hill*, consideration of these factors generally occurs during the determination of the reasonable hourly rate. *Arbor Hill*, 522 F.3d at 184 n.2 ("[I]n calculating the reasonable hourly rate for particular legal services, a district court should consider all relevant circumstances in concluding what a reasonable client would expect to pay.").

fundamental laws are not to proceed with impunity, then citizens must have the opportunity to recover what it costs them to vindicate these rights in court." *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998) (internal citation omitted); *see also City of Riverside v. Rivera*, 477 U.S. 561, 574 (1986) ("a successful civil rights plaintiff often secures important social benefits that are not reflected in nominal or relatively small damages awards").

Finally, it is well-established that, in reviewing voluminous fee applications, it is unrealistic to expect courts to "evaluate and rule on every entry in an application." *N.Y. State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1146 (2d Cir. 1983); *see also Betancourt v. Giuliani*, 325 F.Supp.2d 330, 334 (S.D.N.Y. 2004); *S.W. ex rel. N.W. v. Bd. of Educ. of City of N.Y. (Dist. Two)*, 257 F.Supp.2d 600, 606 (S.D.N.Y. 2003). Along these same lines, the Supreme Court has cautioned that "a request for attorneys' fees should not turn into a second major litigation." *Buckhannon Bd. & Care Home, Inc. v. W. Virgina Dep't Of Health & Human Res.*, 532 U.S. 598, 609 (2001) (quoting *Hensley*, 461 U.S. at 437).

II.  Determination of Attorney's Fees

A.  *Reasonable Hourly Rates*

1.  *Standard for Determining Reasonable Hourly Rates*

The reasonable rates used to determine the amount of

attorney's fees to award are based in part upon the prevailing
rates for similar services in the district in which the awarding
court sits. *Polk v. N.Y. State Dep't of Corr. Servs.*, 722 F.2d
23, 25 (2d Cir. 1983); *Blum v. Stenson*, 465 U.S. 886, 895 n.11
(1984). However, "a district court may use an out-of-district
hourly rate--or some rate in between the out-of-district rate
sought and the rates charged by local attorneys--in calculating
the presumptively reasonable fee if it is clear that a
reasonable, paying client would have paid those higher rates."
*Arbor Hill*, 522 F.3d at 191. In setting reasonable hourly rates,
courts compare the prevailing market rates in the applicable
district with the timekeeper's usual billing rates. *Miele v.
N.Y. State Teamsters Conference Pensions & Ret. Fund*, 831 F.2d
407 (2d Cir. 1987); *Blum*, 465 U.S. at 895 n.11.

Prevailing market rates for similar services are determined
by "rely[ing] on [the court's] own knowledge of comparable rates
charged by lawyers in the district," *Morris v. Eversley*, 343
F.Supp.2d 234, 345 (S.D.N.Y. 2004) (citing *Ramirez v. N.Y. City
Off-Track Betting Corp.*, No. 93-CV-0682, 1997 WL 160369, at *2
(S.D.N.Y. Apr. 3, 1997)), "as well as on evidence submitted by
the parties." *Stirrat v. Ace Audio/Visual, Inc.*, No. CV-02-2842,
2007 WL 2229993, at *2 (E.D.N.Y. July 31, 2007) (citing *Farbotko
v. Clinton County of N.Y.*, 433 F.3d 204, 209 (2d Cir. 2005)). In
addition, "current rates, rather than historical rates, should be

applied in order to compensate for the delay in payment[.]"
*LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998)
(citing *Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989)); *accord*
*Luca v. County of Nassau*, No. 04-CV-4898, 2008 WL 2435569, at *7
n.10 (E.D.N.Y. June 16, 2008).

The district court should also consider case-specific
variables in determining reasonable hourly rates, including, but
not limited to:

> the complexity and difficulty of the case, the available
> expertise and capacity of the client's other counsel (if
> any), the resources required to prosecute the case
> effectively (taking account of the resources being marshaled
> on the other side but not endorsing scorched earth tactics),
> the timing demands of the case, whether an attorney might
> have an interest (independent of that of his client) in
> achieving the ends of the litigation or might initiate the
> representation himself, whether an attorney might have
> initially acted pro bono (such that a client might be aware
> that the attorney expected low or non-existent
> remuneration), and other returns (such as reputation, etc.)
> that an attorney might expect from the representation.

*Arbor Hill*, 522 F.3d at 184.  The size of the firm may also be
considered as a factor in determining the hourly rate, "primarily
due to varying overhead costs."  *Cioffi v. N.Y. Community Bank,*
465 F.Supp.2d 202, 219 (E.D.N.Y. 2006).  Thus, if plaintiff is
represented by a small or medium-sized firm, the appropriate
rates are those typically charged by such firms, whereas a
plaintiff may obtain higher compensation rates if represented by
a large urban firm, since such firms typically charge more per
hour to cover a higher overhead.  *See, e.g., Chambless v.*

*Masters, Mates & Pilots Pension Plan*, 885 F.2d 1053, 1058-59 (2d Cir. 1989).

2. *Determination of Reasonable Hourly Rates*

In this case, plaintiff hired Emory Celli Brinckerhoff & Abady LLP ("ECBA"), a firm whose offices are located out-of-district in the Southern District of New York. ECBA specializes in civil rights litigation, and its attorneys have extensive experience litigating Section 1983 cases in a wide range of contexts. Declaration of Mariann Meier Wang dated April 3, 2009 ("Wang Decl.") at ¶ 75. In particular, the firm has a reputation for a high degree of success in cases brought against New York City for police officer misconduct.[3] *Id.* One judge has gone so far as to take "judicial notice of ECBA's high reputation . . . finding it to be one of the most competent, successful, and reputable civil rights firms practicing in this Court." *Wise v. Kelly*, 05 Civ. 5442, 2008 WL 482399, at *7 (S.D.N.Y. Feb. 21, 2008).

I further note that travel time between the Southern and Eastern Districts is minimal, given that the principal

---

[3] Plaintiff points to multiple examples of such cases in which ECBA represented other plaintiffs, including: *Kunstler v. City of N.Y.*, No. 04 Civ. 1145, 439 F.Supp.2d 327 (S.D.N.Y. 2005) (representing over 50 anti-war protesters allegedly falsely arrested while protesting the Carlyle Group); *Wise v. Kelly*, No. 05 Civ. 5442, 2008 WL 482399 (S.D.N.Y. 2008) (representing a class of mostly homeless individuals arrested pursuant to a statute declared unconstitutional years before the arrests); *McBean v. City of N.Y.*, 233 F.R.D. 377 (S.D.N.Y. 2006) (representing a class of pre-trial detainees who, after arraignment, were allegedly strip-searched without individualized reasonable suspicion). *See* Wang Decl. ¶ 76 for seventeen further examples.

courthouses for each district are minutes away from each other,
on either side of the East River. Although there may be other
civil rights attorneys in the Eastern District with admirable
reputations, a reasonable paying client would, like plaintiff,
hire ECBA even though its office is located in the Southern
District, based on the firm's collective experience, success rate
and proximity to the courthouse in which the litigation would
take place. Accordingly, although this Court is located in the
Eastern District, I will apply the billing rates of attorneys
located in the Southern District. *See New Leadership Comm. v.
Davidson*, 23 F.Supp.2d 301, 304-05 (E.D.N.Y. 1998) (discussing at
length the closely intertwined nature of the Southern and Eastern
Districts of New York).

In addition, I note that ECBA is a mid-size civil rights law
firm that employs 14 lawyers. Wang Decl. ¶ 75. As such, it is
unlike small, one-to-three lawyer firms and nonprofit
organizations, nor is comparable to large Manhattan firms
employing hundreds of lawyers. *See Wise*, 2008 WL 482399, at *7-
8. Accordingly, I will apply the billing rates of mid-size civil
rights law firms located in the Southern District.[4]

a. *Rates for ECBA Attorneys*

I turn first to the rates to be awarded to ECBA attorneys

---

[4] For this reason, the evidence plaintiff has submitted concerning the
billing rates of commercial Manhattan firms employing hundreds of lawyers is
irrelevant.

who performed work on plaintiff's case.

      i.   *Southern District Precedent on Rate Awards*

A review of precedent in the Southern District reveals that rates awarded to experienced civil rights attorneys over the past ten years have ranged from $250 to $600, and that rates for associates have ranged from $200 to $350, with average awards increasing over time. *See, e.g., Rozell v. Ross-Holst,* 576 F.Supp.2d 527, 546 (S.D.N.Y. 2008) (awarding $600 per hour for partners and counsel, $350 for senior associates, and $250 for junior associates in mid-size firm specializing in civil rights employment law); *Wise,* 2008 WL 482399 at *9-10 (awarding ECBA partner with 18 years of experience $425 per hour, ECBA associates with seven or eight years of experience $300 per hour, and ECBA associate with a total of four years of experience but only one year of civil rights experience $250 per hour); *Heng Chan v. Sung Yue Tung Corp.*, No. 03 Civ. 6048, 2007 WL 1373118, at *3-4 (S.D.N.Y. May 8, 2007) (awarding large-firm partner with 16 years of experience $450 per hour, non-profit attorney with fifteen years of experience $400 per hour, large-firm associates with 6 years of experience $300 per hour, and large-firm associate with 2 years of experience $200 per hour); *Access 4 All, Inc. v. Park Lane Hotel, Inc.*, No. CV-04 7174, 2005 WL 3338555, at *5 (S.D.N.Y. 2005) (awarding $350 per hour to attorneys with 20 years of experience); *Kuper v. Empire Blue*

*Cross and Blue Shield*, CV-99-1190, 2003 WL 23350111, at *9-10
(S.D.N.Y. Dec. 18, 2003) (lead attorney of 2-person firm with 35
years of experience awarded $425 an hour); *Cowan v. Ernest
Codelia, P.C.*, No. CV-98-5548, 2001 WL 30501, at *10 (S.D.N.Y.
2001) (awarding a sole practitioner who had been an "active civil
rights litigator for many years" an hourly rate of $250), *aff'd*,
50 Fed. Appx. 36 (2d Cir. 2002); *Pascuiti v. N.Y. Yankees*, 108
F.Supp.2d 258, 266 (S.D.N.Y. 2000) ("range of fees for 'seasoned
civil rights litigators,' particularly those in small firms, is
between $200/hr and $300/hr"); *Marisol v. Giuliani*, 111 F.Supp.2d
381, 387 (S.D.N.Y. 2000) (rates in civil rights case of $350 for
attorneys with more than 15 years of experience, $300 for
attorneys with ten to 15 years of experience, $230-250 for
attorneys with seven to nine years of experience, $180-200 for
attorneys with four to six years of experience, and $130-150 for
attorneys with one to three years' experience).

ii.  *Direct Evidence of Market Rates*

In addition to reviewing legal precedent, I must also
consider the direct evidence of prevailing market rates submitted
by plaintiff.[5]  Plaintiff has submitted three affidavits from

---

[5] The Second Circuit has cautioned against exclusive reliance on
precedent in scenarios where the prevailing party has submitted sufficient
direct evidence of the prevailing market rate, noting that "[r]ecycling rates
awarded in prior cases without considering whether they continue to prevail
may create disparity between compensation available under § 1988(b) and
compensation available in the marketplace.  This undermines § 1988(b)'s
central purpose of attracting competent counsel to public interest
litigation."  *See Farbotko*, 433 F.3d at 208-210.

partners at different law firms in the Southern District with
extensive experience in civil rights law.  First, Nick J.
Brustin, a partner at the law firm of Cochran Neufeld & Scheck,
LLP ("CNS"), states that his four-partner firm's practice "is
devoted almost entirely to civil rights cases" and "charges
comparable rates to ECBA."  Declaration of Nick J. Brustin
("Brustin Decl.") at ¶¶ 1-2, 8.  Specifically, representative CNS
partner rates include $675.00 for a CNS senior partner who
graduated from law school in 1976, $400.00 for a partner who
graduated in 2000, and $300-315 for associates who graduated in
2004 and 2003.  *Id.* ¶ 9.  These rates have formed the basis for
attorney's fees awards in cases which CNS has litigated in
federal courts.  *Id.* ¶¶ 8-9.  Second, Robert L. Herbst, a partner
at the law firm of Beldock Levine & Hoffman, LLP ("BLH"), states
that his law firm "specializes in civil rights and other
litigation" and that based on his experience, ECBA's attorney's
rates "are consistent with prevailing market rates for lawyers
practicing in federal courts in New York City."  Declaration of
Robert L. Herbst ("Herbst Decl.") ¶¶ 3, 6.  Mr. Herbst further
states that as a 1972 graduate from Yale Law School, his present
hourly rate is $650,and that the hourly rates at BLH range from
$400 to $650 for partners and $200 to $280 for associates.  *Id.*
¶¶ 7-8.  Third, Justin Swartz, a partner at the law firm of
Outten & Golden LLP ("O&G"), states that his twelve-partner firm

is "devoted almost entirely to employment law," "regularly
litigate[s] civil rights and class action cases in federal courts
in New York," and "charges comparable rates to ECBA."
Declaration of Justin Swartz ("Swartz Decl.") ¶¶ 1-3, 11.  Mr.
Swartz further states that as a 1998 law school graduate, his
present hourly rate is $550, and that the hourly rates at O&G
range from $450 to $900 for partners and $215 to $450 for
associates.  *Id.* ¶¶ 7, 11.

In addition, plaintiff provides direct evidence of ECBA
attorneys' own market rates, stating that "ECBA is unusual among
New York City law firms in that certain clients retain us and pay
us to litigate their civil rights actions."  Wang Decl. ¶ 90.
Plaintiff argues that where, as here, counsel has an established
billing rate for paying clients with regard to the type of
services performed, that rate is presumptively reasonable.  *See,
e.g.*, *Arbor Hill*, 522 F.3d at 190 ("The reasonable hourly rate is
the rate a paying client would be willing to pay."); *Rozell v.
Ross-Holst*, 576 F.Supp.2d 527, 544 ("rates that plaintiff's
counsel actually charge their clients . . . is obviously strong
evidence of what the market will bear"); *Tamazzoli v. Sheedy*, 804
F.2d 93, 98 (7th Cir. 1986) ("For private counsel with fee-paying
clients, the best evidence is the hourly rate customarily charged
by counsel or by her law firm."); *Gusman v. Unisys Corp.*, 986
F.2d 1146, 1150-51 (7th Cir. 1992) ("the best measure of the cost

of an attorney's time is what that attorney could earn from paying clients. . . . A judge who departs from this presumptive rate must have some reason other than the ability to identify a different average rate in the community."). Plaintiff has also submitted affidavits from ECBA clients who affirm that they regularly pay ECBA its customary rates for its civil rights litigation services. *See* Affidavits of Myrta Cuadra-Lash and Anthony Marraccini. While plaintiff does not specify what percentage of ECBA's lawyers' time is spent serving fee-paying clients in civil rights cases, an ECBA attorney does state that the firm has "always had a significant number of civil rights clients who pay the firm on an hourly basis," and provides several examples of such clients. Declaration of Matthew D. Brinckerhoff at ¶ 2. Other courts have found the percentage of a firm's time spent serving fee-paying clients should be taken into account when determining whether an attorney's claimed hourly rate for certain services is actually reasonable as opposed to presumptively reasonable. *Wise*, 2008 WL 482399 at 8; *Gusman*, 986 F.2d at 1150-51.

### iii. *ECBA's Requested Rates*

The hourly rates submitted by plaintiff for ECBA attorneys having worked on this matter are as follows:

```
1.   Mariann M. Wang:     $450
2.   Kennisha Austin:     $325
3.   Jonathan S. Abady:   $525
4.   Sarah Netburn:       $400
```

```
5.   Eric Hecker:        $450
6.   Ilann M. Maazel:    $450
```

Defendants argue that these rates are unreasonable, and should be reduced as follows:

```
1.   Mariann M. Wang:    $300
2.   Kennisha Austin:    $150
3.   Jonathan S. Abady:  $425
4.   Sarah Netburn:      $250
5.   Eric Hecker:        $300
6.   Ilann M. Maazel:    $300
```

Before turning to defendants' arguments, however, it is necessary briefly to review these ECBA attorneys' backgrounds and experience.

### iv.  *ECBA Attorney Profiles*

Ms. Mariann Wang served as lead counsel for plaintiff in the instant matter, and her time accounts for approximately half of the attorney's fees sought by plaintiff.  Ms. Wang received her J.D. degree from Columbia University School of Law in 1996.  Wang Decl. ¶ 78.  Following a clerkship in the Eastern District of New York, Ms. Wang was a litigation associate at the law firm of Paul Weiss Rifkind Wharton & Garrison for two years.  *Id.* ¶ 80.  Over the next four years, Ms. Wang served as a staff attorney at the American Civil Liberties Union ("ACLU"), and as Director of the Equality and Freedom of Expression Program at Interights, the International Centre for the Legal Protection of Human Rights in London, England.  *Id.* ¶ 81-82.  In June 2003, she joined ECBA, where she became a partner in January 2006.  *Id.* ¶ 83.  While at

ECBA, she has served as lead counsel on numerous civil rights cases, many of which were and are litigated before the Southern and Eastern Districts of New York. *Id.* ¶ 83-85. She currently serves on the Board of the National Employment Lawyers Association – New York, and has lectured and written repeatedly in the areas of Section 1983 and employment law. *Id.* ¶ 86.

Ms. Kennisha Austin served as co-counsel for plaintiff and expended more hours on this matter than any other attorney. While at Columbia University School of Law, from which she received her law degree in 2005, Ms. Austin worked at numerous civil rights organizations including non-profit groups, government offices and a civil rights law firm. *Id.* ¶¶ 93, 97. After clerking for Judge Keith of the Sixth Circuit, she joined ECBA as an associate in 2006. *Id.* ¶¶ 94-95. During her two and a half years with ECBA, Ms. Austin "has represented both individual plaintiffs in federal court who have been the victim[s] of police abuse, as well as organizations . . . who paid her hourly rate for work she performed in bringing their civil rights case[s]." *Id.* ¶ 95. She has also guest lectured at Columbia University School of Law on civil rights and education issues, and received an adjunct appointment at Columbia University Teachers College, where she co-taught a course on civil rights issues in education. *Id.* ¶ 96.

Mr. Jonathan S. Abady expended over 30 hours working on the

instant matter. *Id.* ¶ 108. He received his law degree from New York University School of Law in 1990. *Id.* ¶ 100. Prior to joining ECBA as a partner in 1998, Mr. Abady worked as a trial lawyer and a supervising attorney with the Neighborhood Defender Service of Harlem, as well as an associate at the law firm of Beldock Levine & Hoffman LLP. *Id.* ¶ 101. Before and after joining ECBA, Mr. Abady worked on a wide array of civil rights cases. *Id.* ¶¶ 101-04. In 2008, he was named in The Best Lawyers in America as one of New York's top attorneys in the area of civil rights law. *Id.* ¶ 105.

Ms. Sarah Netburn spent approximately 14 hours working on this matter. *Id.* ¶ 125. She received her law degree in 2001 from the UCLA School of Law. *Id.* ¶ 117. After a federal clerkship, she joined ECBA in 2002 as an associate and became a partner in 2009. Ms. Netburn has litigated multiple civil rights cases, and in 2004 and 2005, the Legal Aid Society awarded her with its 2004 and 2005 Pro Bono Publico Awards. *Id.* ¶¶ 121-22. She has also served as a Member of the Civil Rights Committee for the Association of the Bar of the City of New York. *Id.* ¶ 122.

Mr. Eric Hecker expended approximately ten hours on this matter. *Id.* ¶ 116. He received his law degree in 1997 from the University of Michigan Law School. *Id.* ¶ 109. Prior to joining ECBA in 2002, where he became a partner in 2006, Mr. Hecker clerked for three federal judges and worked at the law firm of

Kirkland & Ellis in New York. *Id.* ¶¶ 110-11. Mr. Hecker's practice focuses on civil rights litigation and commercial litigation, and he teaches a course in election law at Cardozo Law School. *Id.* ¶ 112.

Mr. Ilann Maazel spent approximately nine hours working on this matter. *Id.* ¶ 135. He received his law degree in 1997 from the University of Michigan. *Id.* ¶ 126. Following a clerkship with Judge Walker of the Second Circuit, he joined ECBA in 1998 and became a partner there in 2004. *Id.* ¶¶ 127-28. Mr. Maazel has a diverse trial and appellate practice, which includes a focus on civil rights litigation. *Id.* ¶ 129. He is a columnist for the New York Law Journal, where he regularly writes on civil rights issues, and is the recipient of multiple public service awards. *Id.* ¶¶ 131-32.

v. *Defendants' Arguments Against ECBA's Requested Rates*

As previously noted, defendants argue that the requested rates for the above ECBA attorneys are unreasonable and do not reflect the prevailing market rate for similar services. Rather than submitting independent evidence showing that the rates plaintiff requests for these attorneys are unreasonable, however, defendants rely primarily on two cases for their position, both of which are distinguishable.

Defendants first point to *Jacobson v. Peterbilt Electrical Contracting Inc.*, in which I recently noted that "[c]ourts in

this District have awarded $200-$375 per hour for partners,
$200-$250 per hour for senior associates and $75 per hour for
paralegals." 553 F.Supp.2d 211, 216 (E.D.N.Y. 2008). *Jacobson*,
however, involved an analysis of prevailing rates for ERISA-
related legal services in the Eastern District of New York,
rather than the Southern District rates for civil rights lawyers
that apply here.

Next, defendants discuss *Wise v. Kelly*, 05 Civ. 5442, 2008
WL 482399 (S.D.N.Y. Feb. 21, 2008). In *Wise,* Judge Scheindlin
adopted Magistrate Judge Katz's Report and Recommendation
awarding an ECBA partner who graduated in 1990 a $425 hourly
rate, and an ECBA associate with seven years of experience a $300
hourly rate. *Id.* at *5-9. It is unclear from the court's
decision in *Wise*, however, whether that court had the benefit of
the independent evidence of prevailing market rates submitted by
plaintiff in this case. While the *Wise* court took notice of
affidavits submitted by "at least three attorneys practicing in
this district, with experience in civil rights litigation, [who]
believe[d] that [the ECBA attorney's] rates [we]re reasonable and
appropriate for lawyers with their background and skill," *id.* at
*5, it is unclear whether these affidavits provided examples of
rates charged by members of similar civil rights firms with
various levels of experience. Nor does the *Wise* court mention
whether it considered affidavits of ECBA clients affirming that

they compensate ECBA attorneys at their customary hourly rates.
Because such evidence is before me here, and because the Second
Circuit has specifically directed me to consider it, *see*
*Farbotko*, 433 F.3d at 208-210, I decline to base my determination
of reasonable rates on the court's determination in *Wise*.

vi. *Case-Specific Factors*

In addition, I must consider case-specific factors in
determining reasonable rates.  While ECBA itself acknowledges
that the legal issues involved in this case were relatively
straightforward, *see* Wang Decl. ¶ 35; Pl. Mem. at 35, the factual
issues and type and burden of proof necessary to sustain
plaintiff's claims were more complex than the average case.
Other than the defendant officers and other non-party officers,
there were no eyewitnesses to the events at the heart of this
matter.  Plaintiff was therefore obliged to prove his case
through a thorough review of numerous records -- including
telephone records; medical records; Emergency Medical Technician
("EMT"), Fire Department, and 911 reports and recordings; police
officers' memo books; and campus security log books -- as well as
testimony of witnesses who saw plaintiff after the incident or
who could analyze and opine on his medical records.  Further, it
is an understatement to say that defendants mounted a vigorous
defense in this case.  While defendants have pointed to various
ways in which plaintiff perhaps overzealously sought to press

claims that were later dropped or to prevent the disclosure of

evidence whose disclosure was later compelled,[6] I also credit

plaintiff's account of the ways in which defendants' opposition

unnecessarily multiplied the proceedings,[7] increased the

difficulty and cost of discovery,[8] and effectively foreclosed

settlement following plaintiff's rejection of defendants' initial

---

[6] For example, defendants complain that plaintiff aggressively pursued a lost income claim, which precipitated multiple discovery disputes and several times required court intervention to compel production of records to defendants, only to abandon the claim on the eve of trial. Declaration of Arthur G. Larkin ("Larkin Decl.") ¶¶ 6, 31-53. In addition, defendants protest that plaintiff inappropriately resisted defendants' request for a Rule 35 examination, which was eventually ordered by the magistrate judge. *Id.* ¶¶ 59-64. Indeed, following the court order, plaintiff unilaterally decided that compliance with the order was unnecessary because he had decided not to seek an award for damages arising out of current pain and suffering. *Id.* ¶ 65. As a result, the magistrate judge again directed plaintiff to submit to a Rule 35 examination, and I upheld that order. *Id.* ¶ 67-79. Only then did plaintiff submit to the examination. *Id.* ¶ 80.

[7] Among other instances, plaintiff points to defendants' refusal to produce Civilian Complaint Review Board ("CCRB") and personnel records relating to other complaints of abuse by the defendant officers, despite extensive case law requiring such production. Defendants' position required a hearing before Magistrate Judge Orenstein, who expressed frustration with defendants in ruling in plaintiffs' favor. *See* Wang Decl. ¶¶ 15-16. Similarly, defendants' delay in producing information relating to the identity of officers present at the scene required multiple appearances before the Magistrate Judge. *Id.* ¶¶ 15-16, 19-21.

[8] The record is replete with examples of defendants' delay in producing and taking discovery, as well as instances in which defendants' positions increased discovery costs. For instance, after the close of fact discovery, defendants petitioned the court for permission to depose four of plaintiff's treating physicians, despite plaintiff's representation that he had no intention of calling any of the physicians to testify at trial. Wang Decl. ¶ 27. In addition, in the weeks before trial, defendants belatedly produced many pages of documents obtained from subpoenas on which plaintiff was not copied, which required plaintiff to engage in extensive document review in the midst of trial preparation. *Id.* ¶ 12. Defendants' dilatory conduct with regard to required expert testimony disclosures resulted in a sanctions order against them by Magistrate Judge Orenstein. *Id.* ¶ 45. In addition, plaintiff's counsel alleges that defense counsel refused to consider entering into agreements that would have rendered multiple police officer depositions unnecessary, *id.* ¶¶ 28-29, although defense counsel vigorously contests this allegation. Larkin Decl. ¶¶ 91-93.

Rule 68 offer.[9]  Under these circumstances, a reasonable paying

client would have been willing to pay for the services of an

experienced civil rights law firm with a reputation for success

like ECBA, whose billing rates are on the high end of the

spectrum of market rates for similar services.  Accordingly, the

particular circumstances of this case do not call for a reduction

in reasonable hourly rate awards.

### vii. *Attorney Rate Awards*

In light of the evidence submitted by plaintiff pertaining

to market rates for lawyers in mid-size civil rights firms in the

Southern District of New York, with one exception, I find that

the rates ECBA charges its paying clients generally comport with

the rates charged in the Southern District by lawyers with

comparable experience for similar services.  While the rates fall

on the high end of the spectrum of rates awarded in prior

Southern District cases, they are not unreasonable in light of

that precedent.  Mindful of the Second Circuit's direction not to

"[r]ecycl[e] rates awarded in prior cases without considering

whether they continue to prevail," *Farbotko*, 433 F.3d at 208-210,

as well as my consideration of case-specific factors, with one

---

[9] On October 25, 2005, defendants served plaintiff with an Offer of Judgment pursuant to Federal Rule of Civil Procedure 68 in the amount of $15,001.00, which plaintiff rejected.  Wang Decl. ¶ 14.  Following this offer, in 2007 and 2008, plaintiff repeatedly initiated settlement discussions with defendants, but defendants refused to consider any settlement that was not along the lines of the amount of the Rule 68 offer plus attorneys' fees incurred as of October 2005.  *Id*. ¶¶ 52-62; Wang Reply Decl. ¶¶ 13-20; Larkin Decl. ¶ 17.

exception, the presumptively reasonable fee will be calculated based upon the rates requested by plaintiff.

The exception relates to Ms. Austin's requested rate. As a 2005 graduate from law school, Ms. Austin's requested rate of $325 appears excessive with regard both to prior awards to civil rights attorneys of similar experience, as well as to plaintiff's own evidence of rates charged by civil rights attorneys with three and a half years of experience. *See, e.g., Rozell*, 576 F.Supp.2d at 546 (awarding $350 for senior associates and $250 for junior associates in mid-size firm specializing in civil rights employment law); *Heng Chan*, 2007 WL 1373118, at *3-4 (awarding large-firm associates with 6 years of experience $300 per hour, and large-firm associate with 2 years of experience $200 per hour); Brustin Decl. at ¶ 9 (noting rates of $300-315 for associates who graduated in 2004 and 2003); Herbst Decl. at ¶ 7 (noting rates of $200 to $280 for associates). Accordingly, based on Ms. Austin's three and a half years of legal experience since graduation, including two and a half at ECBA, I find that a reduction from Ms. Austin's requested rate of $325 to a rate of $275 is appropriate.

b.  *Rates for Other Timekeepers*

Plaintiff also seeks to recover fees for the hours five paralegals and one law clerk expended on this matter, at the rates of $125 and $150, respectively. Defendants claim that

these rates are excessive, and appear to request that all six
employees be compensated at the rate of $75 per hour. Defendants
have not submitted independent evidence that these rates are
unreasonable, however, and recent Southern District case law
shows that they are on the high end of the reasonable range. *See
e.g., Access 4 All,* 2005 WL 3338555, at *5 (awarding paralegal
hourly rate of $115); *Morris*, 343 F.Supp.2d at 248 (allowing
paralegal rate of $125 per hour in civil rights case); *Heng Chan*,
2007 WL 1373118 at *5 (awarding between $50 and $150 per hour for
paralegals); *Wise,* 2008 WL 482399, at *11 (awarding $100 per hour
for paralegal and $125 per hour for summer associate time in
civil rights case). For the same reasons discussed above, I find
that the particular circumstances of this case do not warrant a
downward departure from the requested rates. Accordingly, the
presumptively reasonable fee will be calculated based upon the
rates requested by plaintiff for timekeepers other than
plaintiff's attorneys.

B.    *Hours Reasonably Expended*

After awarding reasonable rates, the court must then
determine the reasonable number of hours billed to the matter in
order to calculate the presumptively reasonable fee. *Arbor Hill*,
522 F.3d at 189-90. "[A]ny attorney . . . who applies for
court-ordered compensation . . . must document the application
with contemporaneous time records." *N.Y. State Ass'n for*

*Retarded Children, Inc., v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983). These records should specify, for each attorney, the date, the hours expended and the nature of the work. *Id.* However, "[i]t is not required that counsel describe in great detail how billable time was spent; it is sufficient to identify the general subject matter of time expenditures." *Aiello v. Town of Brookhaven*, No. 94-CV-2622, 2005 WL 1397202, at *2 (E.D.N.Y. June 13, 2005) (citing *Perdue v. City Univ. of N.Y.*, 13 F.Supp.2d 326, 345 (E.D.N.Y. 1998)).

Where documentation of billable hours expended is deficient, the Court may reduce the fee award accordingly. *See Hensley*, 461 U.S. at 433. In addition, the district court "should exclude excessive, redundant or otherwise unnecessary hours[.]" *Quarantino v. Tiffany Corp.*, 166 F.3d 422, 425 (2d Cir.1998). Time spent on matters unrelated to the litigation is also not compensable. *Webb v. Bd. of Educ. of Dyer County, Tenn.*, 471 U.S. 234, 242 (U.S. 1985) ("The time that is compensable under § 1988 is that 'reasonably expended *on the litigation*'") (quoting *Hensley*, 461 U.S. at 433) (emphasis in *Webb*).

Plaintiff's counsel has submitted contemporaneous time records in support of this fee motion. The records are arranged by date and specify which timekeeper performed the services, provide a description of the tasks performed, and state the

number of hours expended on the tasks.[10]  Plaintiff's counsel's
summary of these records, the accuracy of which defendants do not
appear to question, is as follows:

| Attorneys | | Paralegals/Law Clerk | |
|-----------|-------|----------------------|-------|
| NAME | HOURS | NAME | HOURS |
| Mariann M. Wang | 1109.95 | Jessica Buchanan | 35.05 |
| Kennisha Austin | 1236.55 | Joanna Jia | 17.45 |
| Jonathan S. Abady | 32.45 | Janine Morna | 40.70 |
| Sarah Netburn | 13.90 | Senna Riahi | 63.00 |
| Eric Hecker | 9.50 | Mary Kuder | 103.25 |
| Ilann M. Maazel | 8.55 | Kim Cooper | 19.50 |

Defendants argue, for a variety of reasons, that the hours
billed by Ms. Wang and Ms. Austin are unreasonable.  They suggest
that Ms. Wang's and Ms. Austin's hours should be reduced by 20%
and 40%, respectively.  I find the majority of defendants'
arguments to be without merit, but nevertheless conclude that
certain reductions are warranted.

1.  *Hours Unrelated to the Litigation*

Defendants contend that the approximately 24.1 hours
plaintiff's attorneys expended communicating with the Civilian
Complaint Review Board ("CCRB") and preparing for and attending

---

[10] Plaintiff also requests an award of attorney's fees for work
performed on post-trial motions, including this motion, since March 1, 2009.
In his reply, he clarifies that "[p]laintiff will submit a supplemental fee
application for time spent and disbursements paid . . . on post-trial motion
practice," noting that "[d]efendants have not taken issue with such an
approach."  Pl.'s Reply at 1 n.1.  Accordingly, I do not consider fees for
work performed on post-trial motions in this memorandum opinion and order.

the 50-H administrative hearing required by New York law, which occurred prior to the filing of the complaint, are unrelated to this litigation and thus not compensable.[11]  However, as plaintiff points out, the 50-H hearing is a requisite administrative predicate to filing suit against the City of New York.  Courts have held that work relating to such hearings is compensable. *See N.Y. Gaslight Club, Inc. v. Carey*, 447 U.S. 54, 61 (1980) (interpreting the "action or proceeding" language of 42 U.S.C. § 2000e-5(k), also found in § 1988, and noting that "Congress' use of the broadly inclusive disjunctive phrase 'action or proceeding' indicates an intent to subject the losing party to an award of attorney's fees and costs that includes expenses incurred for administrative proceedings."); *Lily v. County of Orange*, 910 F. Supp. 945, 950 (S.D.N.Y. 1996) (noting payment of attorney's fees for hours expended attending 50-H hearing and reviewing 50-H transcript).[12]  The same reasoning applies to time expended relating to plaintiff's CCRB proceedings, especially in light of the fact that these proceedings were utilized

---

[11] Plaintiff's counsel states that only 13.3 such hours were expended. Declaration of Kennisha Austin dated May 15, 2009 ("Austin Decl.") ¶ 2.  In light of my conclusion below, I need not resolve this dispute.

[12] In support of their argument, defendants cite *Delancett v. Village of Saranac Lake*, in which the court found that hours related to a 50-H hearing were "not fairly compensable as part of this lawsuit." 986 F.Supp. 126, 129 (N.D.N.Y. 1997).  However, *Delancett* involved several defendants' requests for attorney's fees rather than a plaintiff's request, and it is unclear from the opinion whether the 50-H hearing in question was an administrative prerequisite to that particular lawsuit, whether defendants might have waived their right to the hearing, and indeed who attended the hearing.  Accordingly, *Delancett* is distinguishable from this case.

extensively by both parties during motion practice and at trial. Accordingly, I find that hours expended on the CCRB proceedings and the 50-H hearing were reasonably related to this litigation, and I decline to deduct those hours from my calculation of reasonable hours.

2.  *Excessive and Redundant Hours*

Defendants also seek a reduction on the grounds that plaintiffs' attorneys billed excessive and redundant hours for routine tasks.  I note, however, that plaintiff's counsel has already excluded significant amounts of time in the exercise of billing discretion, including the time of other ECBA attorneys who occasionally contributed substantive work.  Wang Decl. ¶ 67. In addition, as noted on the time records themselves, ECBA declined to charge for over 50 hours of attorney time in instances where two or more attorneys attended to one task, even though some such entries are arguably not duplicative.  *See, e.g.*, *Rozell v. Ross-Holst et al.*, 576 F.Supp.2d 527, 541 (S.D.N.Y. 2008) (noting that it is not unreasonable for two attorneys to attend critical proceedings).  *Id.* ¶ 68. Nevertheless, I proceed to consider defendants' specific arguments relating to allegedly excessive or redundant hours.

First, defendants argue that excessive amounts of time, usually either fifteen minutes or six minutes, were billed for discrete, simple matters such as leaving voice mail messages or

sending routine emails.  Upon review of plaintiff's records, however, I find no evidence that the time billed by plaintiff for any of these tasks was excessive, and I decline to impose a reduction on this ground.

Next, defendants argue that an excessive amount of hours was billed for legal research, especially in light of ECBA's expertise in civil rights law.  However, the bulk of the entries cited by defendants relates to time spent not only on research, but also on drafting of briefs and letters to the court.  According to plaintiff's counsel, the total amount of hours spent solely on legal research is approximately 45.6 hours.  Austin Decl. ¶¶ 3-4.  These hours, spread over a two-year period, do not constitute an unreasonable or excessive amount of time spent on legal research.

Defendants also argue that Ms. Austin billed excessive hours because she is a junior associate who required training in civil rights litigation.  Most notably, defendants point to the 25.5 hours Ms. Austin spent preparing for a 15-minute oral argument on defendants' summary judgment motion.  In their reply papers, plaintiff's attorneys agree not to charge for 20 hours of that time.  Reply Wang Decl. ¶ 10.  In addition, I find it plausible, if not likely, that a reasonable paying client would request and receive a reduction in the hours billed by a junior attorney to account for the training time necessarily incorporated into the

hours billed by that junior attorney.  There is no evidence that plaintiff has already excised any hours on account of junior associate training.  Standing in the shoes of a reasonable paying client, as I must, *see Arbor Hill*, 522 F.3d at 184, I find that a 5% reduction in Ms. Austin's hours is warranted on this ground. Accordingly, in addition to the 20 hours plaintiff has agreed to deduct, I further deduct 60.8 hours from Ms. Austin's total hours billed.

Defendants next take issue with hours billed for travel time, pointing to three instances in which attorney travel time was purportedly not separately noted so that it could be billed at 50% of the attorney's normal hourly rate.  Plaintiff's counsel has explained, however, that in two of these entries, travel time was simply not billed at all, as ECBA's practice is only to charge for time traveling that would not normally have been otherwise incurred commuting to work at ECBA's offices.  Reply Wang Decl. ¶ 11.  Plaintiff further concedes that with regard to the third entry, an hour and a half of Ms. Austin's time should be accounted for as travel time and billed at 50% of Ms. Austin's hourly rate.  Austin Decl. ¶ 11; Reply Wang Decl. ¶¶ 10, 12. Accordingly, I will deduct a further 0.75 hours from Ms. Austin's hours as submitted.

Finally, defendants argue that that ECBA attorneys billed excessive amounts of time for drafting and reviewing letters to

this court, engaging in motion practice, and trial preparation. These activities were, however, essential to the litigation of plaintiff's case, and I find no evidence that plaintiff's attorneys billed unnecessary or excessive hours while performing them. Accordingly, no reduction is warranted on this ground.

3. *Vague Billing*

A court can also reduce entries which "are too vague to sufficiently document the hours claimed." *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 172 (upholding reduction of 20% for entries such as "letter to court," "staff conference," or "work on motion"); *see also Trs. of the Bricklayers & Allied Craftworkers Local 5 N.Y. Ret., Welfare & Training Funds v. Helmer-Cronin Const., Inc.*, No. 03 Civ. 748, 2005 WL 3789085, at *5 (S.D.N.Y. Oct. 24, 2005) (20% reduction in the total number of hours billed where the majority of the record consisted of vague entries such as, "Study and Review file," "Telephone call with client," "Letter to Silkey," and "Research"). However, "where an attorney's time entries are vague, courts may attempt to decipher them by reference to the 'context in which these entries occur [to determine] what work was involved.'" *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 970 F.Supp. 333, 342 (S.D.N.Y. 1997) (quoting *Lenihan v. City of N.Y.*, 640 F.Supp. 822, 826 (S.D.N.Y. 1986)).

Defendants argue that those of ECBA's time entries which neglect to specify the subject matter of the task performed (such as "phone call with M. Wang" or "telecon with H. Vilkhu") warrant an across-the-board reduction. On the whole, I find ECBA's records to be remarkably precise and detailed; entries that do not specify the nature of the work performed, or for which it is difficult or impossible to infer the nature of the work performed from the context of the entry, are the exception rather than the rule. Accordingly, I decline to apply an across-the-board percentage reduction for vagueness. I have, however, reviewed the specific entries to which defendants object, and I find that a 20% reduction for vagueness is warranted with regard to 38.25 hours billed by Ms. Austin and 3.05 hours billed by Ms. Wang.[13] Accordingly, I will deduct 7.65 hours from Ms. Austin's total hours and 0.61 hours from Ms. Wang's total hours billed in calculating the presumptively reasonable fee.

_____

[13] Specifically, I find that a reduction is warranted with regard to the following entries, most of which represent only a portion of the time billed by a particular attorney on a particular day (attorney's initials are noted): 3.5 hrs by KA on 12/18/06; 1.5 hrs by KA on 12/19/06; 1.10 hrs by KA on 12/21/06; 2 hrs by KA on 1/3/07; 0.95 hrs by KA on 1/10/07; 0.35 hrs by KA on 1/16/07; 0.8 hrs by KA on 1/18/07; 0.30 hrs by KA on 1/23/07; 2.4 hrs by KA on 1/24/07; 1.35 hrs by KA on 1/25/07; 0.9 hrs by KA on 1/26/07; 0.5 hrs by MMW and 1.35 hrs by KA on 1/30/07; 0.6 hrs by KA on 2/1/07; 2 hrs by KA on 2/5/07; 1.05 hrs by KA on 2/8/07; 0.10 hrs by KA on 3/23/07; 0.9 hrs by KA on 3/28/07; 1.75 hrs by MMW and 2.1 hrs by KA on 3/29/07; 0.6 hrs by KA on 4/5/07; 1.2 hrs by KA on 4/12/07; 3.8 hrs by KA on 4/17/07; 1.2 hrs by KA on 4/18/07; 0.8 hrs by KA on 4/19/07; 0.3 hrs by KA on 4/24/07; 1.9 hrs by KA on 4/25/07; 0.7 hrs by KA on 4/26/07; 1.4 hrs by KA on 5/3/07; 0.1 hrs by KA on 5/4/07; 0.25 hrs by MMW on 5/7/07; 0.25 hrs by MMW and 0.4 hrs by KA on 6/12/07; 0.3 hrs by KA on 9/19/07; 0.5 hrs by KA on 9/26/07; 0.3 hrs by KA on 9/28/07; 0.3 hrs by KA on 10/2/07; 0.3 hrs by MMW on 10/3/07; 0.4 hrs by KA on 10/8/07; 0.4 hrs by KA on 2/7/08; 0.2 hrs by KA on 4/2/08; 0.2 hrs by KA on 8/8/08.

4. *Unsuccessful Claims*

In calculating reasonable hours expended, the court should deduct "hours dedicated to severable unsuccessful claims." *Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999). Defendants argue that I should deduct the hours ECBA spent preparing for the summary judgment motion, since that motion involved almost exclusively claims upon which plaintiff did not prevail at trial, including his equal protection, Section 1981, false arrest and imprisonment, state constitution and negligence claims. *See Vilkhu v. City of N.Y.*, No. 06-CV-2095, 2008 WL 1991099 (E.D.N.Y. May 5, 2008). For reasons stated more fully below, however, I find that these unsuccessful claims were not "severable" from plaintiff's successful excessive force and battery claims because all of plaintiff's claims arose out of the same core of operative facts and involved essentially the same proof. *See Quarantino*, 166 F.3d 422 ("Attorney's fees may be awarded for unsuccessful claims as well as successful ones, however, where they are inextricably intertwined and involve a common core of facts or are based on related legal theories.") (internal quotation marks and citations omitted).

In addition, plaintiff's decision to oppose defendants' summary judgment motion was a reasonable use of resources at the time. "The relevant issue . . . is not whether hindsight vindicates an attorney's time expenditures, but whether, at the

time the work was performed, a reasonable attorney would have
engaged in similar time expenditures." *Grant v. Martinez*, 973
F.2d 96, 99 (2d Cir. 1992). Further, plaintiff did prevail at
trial on a key claim that survived defendant's summary judgment
motion. In my memorandum opinion and order, I determined that
plaintiff's state constitutional claims against the City of New
York could not be dismissed as a matter of law, and that material
factual issues existed regarding those claims such that summary
judgment was inappropriate.[14] Plaintiff ultimately prevailed on
his excessive force claim under the New York State constitution
against New York City, based on a respondeat superior theory
(which does not apply in the § 1983 context). Plaintiff's
successful opposition to the dismissal of his state constitution
claims ultimately resulted in a verdict against the City which
otherwise would have been precluded by law. Accordingly, because
plaintiff's claims are not severable from each other and because
plaintiff prevailed on a key issue in opposing defendants'

---

[14] Specifically, I noted as follows:

As part of his New York state constitution claims, plaintiff argues that
the City, as the employer of the officers, is responsible for their
conduct under the doctrine of respondeat superior. Because Section 1983
does not recognize respondeat superior liability, the narrow exception
of *Brown* applies to plaintiff's state constitution claims against the
City and they will not be dismissed. Since the claims against the City
are not dismissed as a matter of law, I turn to the facts supporting
those claims. Because there are material factual disputes concerning
the officers' actions, a jury must determine whether the City is liable
for the defendant officers' actions under the theory of respondeat
superior. Accordingly, defendants' motion for summary judgment on the
state constitutional claims against the City are denied.

*Vilkhu*, 2008 WL 1991099 at *9.

summary judgment motion, the hours plaintiff's attorneys expended
on the summary judgment motion will not be deducted.

    5.    *Unreasonable Tactics*

    Finally, defendants argue that plaintiff's counsel should
not be compensated for time spent pursuing claims or taking
positions that were unreasonable or untimely.  Indeed, counsel
may be denied compensation for claims that were abandoned, *see
Cooper v. Sunshine Recoveries, Inc.*, No. 00 Civ. 8898, 2001 WL
740765, at *3 (S.D.N.Y. June 27, 2001) (denying compensation for
class claims never pursued), motions that were unreasonable or
had little chance of success, *see Reiter v. Metro. Transp. Auth.
of N.Y.*, No. 01 Civ. 2762, 2007 WL 2775144, at *10-12 (S.D.N.Y.
Sept. 25, 2007), and submissions that failed to comply with court
orders, *see Marisol A. ex rel. Forbes v. Giuliani*, 111 F.Supp.2d
381, 394 (S.D.N.Y. 2000) (denying fees for untimely expert
report).  However, "a court should not disallow fees for every
motion that a prevailing party did not win.  Reasonable paying
clients may reject bills for time spent on entirely fruitless
strategies while at the same time paying their lawyers for
advancing plausible though ultimately unsuccessful arguments."
*Rozell v. Ross-Holst*, 576 F.Supp.2d 527, 538 (S.D.N.Y. 2008).

    The majority of defendants' allegations concerning
plaintiff's counsel's purportedly unreasonable tactics are
without merit.  As previously noted, defendants mounted an

extremely vigorous defense in this case, which required

plaintiff's attorneys to expend large quantities of time

responding to defendants' various requests, refusals, and court

petitions.  As the Second Circuit has noted:

> [I]n litigating a matter, an attorney is in part reacting to
> forces beyond the attorney's control, particularly the
> conduct of opposing counsel and of the court.  If the
> attorney is compelled to defend against frivolous motions
> and to make motions to compel compliance with routine
> discovery demands, or to respond to unreasonable demands of
> the court for briefing or for wasteful, time-consuming court
> appearances, the hours required to litigate even a simple
> matter can expand enormously.

*Kassim v. City of Schenectady*, 415 F.3d 246, 252 (2d Cir. 2005);

*see also City of Riverside v. Rivera*, 477 U.S. 561, 581 n.11

(1986) ("The government cannot litigate tenaciously and then be

heard to complain about the time necessarily spent by the

plaintiff in response.") (internal citation omitted).  The record

of this case, including the 255 entries on the docket up to and

including my denial of defendants' motion for a new trial, as

well as the Magistrate Judge's and my own admonishments to the

parties on account of their excessive hostility toward each

other, *see, e.g.*, Larkin Decl. Ex. 4 at 2 (transcript including

the Magistrate Judge's direction to the parties to "chill out" in

light of the "out of control" tone employed in the parties'

letters and the pettiness of the disputes raised therein), bear

witness to the unreasonably litigious nature of these

proceedings.  Defendants' own conduct precipitated much of this

unpleasantness, and accordingly, their position that the hours expended by plaintiff should be substantially reduced on this ground rings hollow.

Nevertheless, defendants have identified a few instances in which plaintiff's attorneys engaged in unreasonable or untimely behavior without apparent correlation to actions taken by defendants. For instance, plaintiff's attorneys were delinquent in questioning plaintiff and other relevant parties about records pertaining to plaintiff's lost income claim, which required multiple court interventions and resulted in the tardy disclosure of these documents to defendants. Larkin Decl. ¶¶ 33-43; *id.* Exs. 5-9. After extensive discovery and hearings before both the Magistrate Judge and the undersigned on this subject, plaintiff ultimately withdrew his lost income claim on the eve of trial -- although, as plaintiff points out, defendants relied on lost-income-related discovery for other purposes at trial. Reply Wang Decl. ¶ 22-23. In addition, plaintiff's position with regard to the Rule 65 medical examination requested by defendants was unreasonable. While plaintiff's objections to the examination were legitimate (albeit unsuccessful), the unilateral decision without notice to the court not to submit to the examination as ordered by the Magistrate Judge -- because, in plaintiff's opinion, the withdrawal of his claim for current pain and suffering rendered it unnecessary -- was unreasonable. *See*

Larkin Decl. ¶¶ 64-65.  Finally, plaintiff's approach to the
parties' pre-trial motions in limine, concerning which I noted on
the record that plaintiff's positions bordered at times on the
frivolous, is a further example of the generally overzealous
nature of this litigation.  *See id.* ¶¶ 109-11, *id.* Ex. 34
(partial transcript of hearing on motions in limine).  For these
reasons, I find that a 5% reduction in the hours submitted by Ms.
Wang and Ms. Austin is warranted, as Ms. Wang and Ms. Austin are
the two attorneys whose time accounts for the vast majority of
the work performed on plaintiff's behalf in this matter.
Accordingly, I will deduct 55.5 hours from Ms. Wang's total hours
and 61.83 hours from Ms. Austin's total hours.

     6.   *Non-Attorney Time*

    Defendants submit that the records of hours billed by the
ECBA paralegals and law clerk "suffer from many of the same
infirmities as those set forth" with regard to plaintiff's
attorneys.  Without specific references to disputed entries to
guide it, this Court declines to review the voluminous record to
determine which non-attorney time entries are vague, excessive,
or unrelated to the litigation.  Accordingly, I decline to reduce
the hours submitted by non-attorney timekeepers.

     7.   *Calculation of Reasonable Hours Expended*

    Applying my findings above to the hours actually billed by
plaintiff's counsel results in the following calculation of

reasonable hours expended by ECBA timekeepers:

| TIMEKEEPER & HOURS | REDUCTIONS | | | TOTAL HOURS |
|---|---|---|---|---|
| | excessive hours | vague billing | unreasonable tactics | |
| Wang 1109.95 | | (0.61) | (55.5) | 1053.84 |
| Austin 1236.55 | (81.55) | (7.65) | (61.83) | 1085.52 |

C.   *Calculation of the Presumptively Reasonable Fee*

Using the rates awarded to each timekeeper and the reasonable hours calculated above, the calculation of the presumptively reasonable fee is as follows:

| TIMEKEEPER | RATE | HOURS | FEE |
|---|---|---|---|
| Mariann M. Wang | $450 | 1053.84 | $474,228.00 |
| Kennisha Austin | $275 | 1085.52 | $298,518.00 |
| Jonathan S. Abady | $525 | 32.45 | $17,036.25 |
| Sarah Netburn | $400 | 13.90 | $5,560.00 |
| Eric Hecker | $450 | 9.50 | $4,275.00 |
| Ilann M. Maazel | $450 | 8.55 | $3,847.50 |
| All Paralegals | $125 | 259.45 | $32,431.25 |
| Law Clerk | $150 | 19.50 | $2,925.00 |
| | | TOTAL FEE: | $838,821.00 |

D.   *Adjustment of the Presumptively Reasonable Fee*

As previously noted, following my calculation of the presumptively reasonable fee in the amount of $838,821, I must now consider whether an adjustment of the presumptively reasonable fee is warranted.  *See Hensley*, 461 U.S. at 434 & n.9.

For various reasons, defendants submit that the presumptively reasonable fee should be reduced by 90%. Bearing in mind the strong presumption in civil rights cases that the presumptively reasonable fee is, in fact, reasonable, *see LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998), I consider each of defendants' arguments in favor of a reduction in turn.

1. *Unsuccessful Claims*

Defendants first argue that the fee award should be substantially reduced because plaintiff was unsuccessful on the majority of his claims. Indeed, while judgment was entered against the City and the two defendant officers on plaintiff's excessive force and battery claims, plaintiff did not prevail at trial on his various claims for intentional discrimination, false arrest and imprisonment, and assault.[15]

In *Hensley v. Eckerhart*, the Supreme Court held that in considering whether to adjust the product of reasonable hours times reasonable rates in awarding attorney's fees, courts should consider whether "the plaintiff fail[ed] to prevail on claims that were unrelated to the claims on which he succeeded[.]" *Hensley v. Eckerhart*, 461 U.S. 424, 434 (U.S. 1983). The Court further explained:

---

[15] Plaintiff also asserted claims of general negligence and negligent hiring, as well as various claims against other officers, but these claims were dismissed or withdrawn before trial. *Vilkhu v. City of N.Y.*, No. 06-CV-2095, 2008 WL 1991099, at *4 n.7, 9 (E.D.N.Y. May 5, 2008); *Vilkhu v. City of N.Y.*, No. 06-CV-2095, 2009 WL 537495, at *1 n.1 (E.D.N.Y. Mar. 3, 2009).

In some cases a plaintiff may present in one lawsuit
distinctly different claims for relief that are based on
different facts and legal theories.  In such a suit, even
where the claims are brought against the same defendants --
often an institution and its officers, as in this case --
counsel's work on one claim will be unrelated to his work on
another claim.  Accordingly, work on an unsuccessful claim
cannot be deemed to have been expended in pursuit of the
ultimate result achieved.  The congressional intent to limit
awards to prevailing parties requires that these unrelated
claims be treated as if they had been raised in separate
lawsuits, and therefore no fee may be awarded for services
on the unsuccessful claim.

*Id.* at 434-35 (internal quotation marks and citation omitted).

The *Hensley* Court further noted, however, that where the

plaintiff's claims "involve a common core of facts or [are] based

on related legal theories[,] [m]uch of counsel's time will be

devoted generally to the litigation as a whole . . . . Such a

lawsuit cannot be viewed as a series of discrete claims."  *Id.* at

435.  Accordingly, interpreting *Hensley*, the Second Circuit has

held that lack of success on all claims does not automatically

trigger a reduction in the presumptively reasonable fee:  "A

plaintiff's lack of success on some of his claims does not

require the court to reduce the lodestar amount where the

successful and the unsuccessful claims were interrelated and

required essentially the same proof."  *Murphy v. Lynn*, 118 F.3d

938, 952 (2d Cir. 1997) (citing *Hensley* and collecting cases);

*see also LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 762 (2d

Cir. 1998) ("When a plaintiff has achieved substantial success in

the litigation but has prevailed on fewer than all of his claims,

the most important question in determining a reasonable fee is whether the failed claim was intertwined with the claims on which he succeeded.").

Here, plaintiff's claims arose from a common core of facts: namely, the events that occurred on the evening of May 8, 2005. Each of plaintiff's claims required a thorough presentation of the evidence relating to the events of that evening, and none of plaintiff's claims could have stood independently from a showing of those events.  Defendants argue that many of plaintiff's unsuccessful claims were nevertheless distinct and separable from his successful claims because they involved different legal theories or required proof of facts which were not accepted by the jury.  In this vein, they argue that plaintiff's discrimination claim and false arrest claim required showings of discriminatory intent and confinement, respectively, neither of which element is required to sustain the claims of excessive force and battery on which plaintiff ultimately prevailed. However, defendants overlook the fact that in proving his excessive force and battery claims, plaintiff was, as a practical matter, required to explore in considerable detail the events of the night of May 8, 2005.  Plaintiff's showing of these events necessarily included his allegation that the defendant officers used racial epithets against him and restrained him against his will.  While the jury either did not credit these allegations, or

did not find the evidence at trial sufficient to prove by a
preponderance intent to discriminate and legal confinement, the
fact remains that plaintiff would have presented the same
evidence in proving his excessive force and battery claims
regardless of whether he asserted claims for discrimination and
false arrest.[16]  Therefore, the claims on which plaintiff was
unsuccessful were factually intertwined with the claims on which
he prevailed, and accordingly, I decline to reduce the
presumptively reasonable fee on account of plaintiff's lack of
success on those claims.

    2.   *Extent of Plaintiff's Success*

    Next, defendants argue that the presumptively reasonable fee
should be reduced because the extent of plaintiff's success was
minimal when compared to the relief he originally sought.  In
*Hensley*, the Supreme Court directed district courts to review the
presumptively reasonable fee in light of whether "the plaintiff
achieve[d] a level of success that makes the hours reasonably
expended a satisfactory basis for making a fee award[.]"
*Hensley*, 461 U.S. at 434.  The Court further explained that the
plaintiff's success or failure on the litigation as a whole, even

---

[16] Similarly, defendants argue that plaintiff's claims against other
officers named as defendants in the amended complaint were unsuccessful
because he stipulated to their dismissal prior to trial, and further, that
they are severable from his successful claims because had he not named the
officers as defendants, he would not have needed to depose them.
Nevertheless, these officers were all present on the evening of May 8, 2005,
and therefore, plaintiff would have deposed them as eyewitnesses of the events
of that evening regardless of whether or not he named them as defendants.

where the plaintiff's claims are factually or legally

intertwined, should be considered:

> If . . . a plaintiff has achieved only partial or limited
> success, the product of hours reasonably expended on the
> litigation as a whole times a reasonable hourly rate may be
> an excessive amount.  This will be true even where the
> plaintiff's claims were interrelated, nonfrivolous, and
> raised in good faith.  Congress has not authorized an award
> of fees whenever it was reasonable for a plaintiff to bring
> a lawsuit or whenever conscientious counsel tried the case
> with devotion and skill.

*Id.* at 436.  *See also Diaz v. Paragon Motors of Woodside, Inc.*,

No. CV-03-6466, 2007 WL 2903920, at *5 (E.D.N.Y. Oct. 1, 2007).

Indeed, "[t]he Second Circuit has stated that the 'most

important factor in determining the reasonableness of a fee is

the degree of success obtained.'"  *Weingarten v. Optima Commc'ns*

*Sys., Inc.*, 544 F.Supp.2d 193, 196 (S.D.N.Y. 2008) (quoting *Pino*

*v. Locascio*, 101 F .3d 235, 237 (2d Cir. 1996)).  The Second

Circuit recently provided guidance on evaluating a plaintiff's

"degree of success":

> A district court's assessment of the degree of success
> achieved in a case is not limited to inquiring whether a
> plaintiff prevailed on individual claims.  Both the quantity
> and quality of relief obtained, as compared to what the
> plaintiff sought to achieve as evidenced in [his] complaint,
> are key factors in determining the degree of success
> achieved.

*Barfield v. N.Y. City Health and Hosps. Corp.*, 537 F.3d 132, 152

(2d Cir. 2008).  However, both the Supreme Court and the Second

Circuit have cautioned that an award of reasonable attorney's

fees need not be proportionate to any award of money damages

returned by a jury.  *See City of Riverside v. Rivera*, 477 U.S. 561, 575 (1986) ("Because damages awards do not reflect fully the public benefit advanced by civil rights litigation, Congress did not intend for fees in civil rights cases, unlike most private law cases, to depend on obtaining substantial monetary relief."); *Kassim v. City of Schenectady*, 415 F.3d 246, 252 (2d Cir. 2005) (noting that the Second Circuit has "repeatedly rejected the notion that a fee may be reduced merely because the fee would be disproportionate to the financial interest at stake in the litigation").

There is merit to defendants' argument that plaintiff achieved limited success in relation to the relief he originally sought.  First, while I have already determined that all of plaintiff's claims arise out of a common core of facts, it bears noting that plaintiff only succeeded on three of the eleven claims for relief set forth in his amended complaint.  Further, plaintiff swore in his interrogatory answers and at his deposition that he had lost $100,000 to $125,000 in income due to injuries sustained during the incident at the heart of this case. Larkin Decl. ¶¶ 35, 44.  While plaintiff withdrew his claim for lost income just before trial, the lost income claim was a substantial part of the relief sought by plaintiff during the majority of these proceedings.  In addition, plaintiff sought punitive damages, which were not awarded by the jury despite the

lurid nature of plaintiff's description of the events of May 8, 2005.  Ultimately, the jury only awarded plaintiff compensatory damages in the amount of $20,000.[17]

Nevertheless, plaintiff successfully proved that the defendant officers violated his constitutional rights by using excessive force against him and battering him, and that the City was responsible for the officers' conduct on a theory of *respondiat superior*.  Accordingly, judgment was entered against both the defendant officers and the City.  As the Supreme Court has observed, in police misconduct cases, a private action for damages that is successful "contributes significantly to the deterrence of civil rights violations in the future."  *Rivera*, 477 U.S. at 575 (citing *McCann v. Coughlin*, 698 F.2d 112, 129 (2d Cir. 1983)).  Thus, plaintiff's success, both in terms of its monetary value to plaintiff and deterrence value to the public, was not insubstantial.  However, in light of the fact that plaintiff did not secure the full "quality and quantity" of the relief he initially sought, I find that a 20% reduction in the

---

[17] I further note that the $20,000 damages award obtained by plaintiff was remarkably similar to the $15,001 offered by defendants pursuant to Rule 68 of the Federal Rules of Civil Procedure.  While rejection of a Rule 68 offer in and of itself does not, as is more fully explained below, warrant a fee reduction, the similarity between defendants' Rule 68 offer and the amount of damages ultimately recovered nevertheless suggests that plaintiff consistently overstated the value of his claims.  Accordingly, it is appropriate to take this similarity into account when assessing the extent of plaintiff's success.  *See generally Sheppard v. Riverview Nursing Center, Inc.*, 88 F.3d 1332, 1337 (4th Cir.), *cert denied*, 419 U.S. 993 (1996) (even where Rule 68 offer would not bar recovery of attorney's fees, "consideration [of the offer] seems a sensible one in light of *Farrar's* concerns with the degree of success achieved by the plaintiff and the public purposes served by the litigation").

presumptively reasonable fee is appropriate.

    3.   *Effect of Defendants' Rule 68 Offer*

Defendants argue that in light of plaintiff's rejection of their offer of judgment pursuant to Federal Rule of Civil Procedure 68 in the amount of $15,001, a sum remarkably close to the $20,000 damages award ultimately returned by the jury, a substantial reduction in attorney's fees is warranted. I disagree. The Second Circuit has held that a party's rejection of a settlement offer should not be used to reduce a fee award. "Absent a showing of bad faith, a party's declining settlement offers should [not] operate to reduce an otherwise appropriate fee award." *Ortiz. v. Regan*, 980 F.2d 138, 141 (2d Cir. 1992) (internal quotation marks and citation omitted). Other appellate courts have followed this principle in the Rule 68 context, expressing the view that attorney's fees need not be reduced solely because the amount of damages ultimately awarded by the jury was similar to the amount offered by defendants pursuant to Rule 68. *See Bright v. Land O'Lakes, Inc.*, 844 F.2d 436, 443 (7th Cir. 1998); *United Auto. Workers Local 259 Social Sec. Dep't. v. Metro Auto Center*, 501 F.3d 283, 291-92 (3d Cir. 2007) ("[W]e do not agree with [the defendant] that its offer of judgment needed to factor into the award."); *c.f. Sheppard*, 88 F.3d 1332 at 1337.

Further, while the amount of damages awarded by the jury and the amount contemplated in the Rule 68 offer were similar, the final judgment and the Rule 68 offer differed in two important respects. The Rule 68 offer expressly provided that it was "not to be construed as an admission of liability by any defendant . . . nor is it an admission that plaintiff Harwinder Vilkhu has suffered any damages." *See* Wang Decl. Ex. F (copy of offer). By contrast, after trial, the jury returned a verdict in plaintiff's favor and awarded him compensatory damages, and judgment was entered against both the City and the officer defendants. In terms of non-quantitative relief, therefore, the Rule 68 offer included none of the relief ultimately secured by plaintiff. For this reason, and in light of the Second Circuit's directive not to reduce a fee award due to a plaintiff's rejection of a settlement offer, I decline to reduce the presumptively reasonable fee solely on account of plaintiff's rejection of defendants' Rule 68 offer.

4. *Total Attorney's Fee Award*

For the reasons set forth above, pursuant to the considerations set forth by the Supreme Court in *Hensley*, the presumptively reasonable fee ($838,821.00) is reduced by 20% on account of the partial success achieved by plaintiff. Accordingly, I award reasonable attorney's fees to plaintiff in the amount of $671,056.80.

III. <u>Determination of Costs</u>

Plaintiff seeks a further award for costs in the amount of $100,039.76. *See* Wang Decl. ¶¶ 73-74; *id.* Ex. JJ (records accounting for costs). Specifically, plaintiff seeks to recover for the following costs:

| CATEGORY | AMOUNT |
|---|---|
| Witness Fees | $90.00 |
| Subpoenas | $55.00 |
| Trial Materials | $1,854.83 |
| Translation | $3,250.00 |
| Legal Research - Database Access | $6,268.21 |
| Document Retrieval & Process Server | $2,089.64 |
| Court Reporters | $32,606.26 |
| Consultant/Expert Fees | $41,818.06 |
| Medical Records Fees | $102.81 |
| Messenger | $1,291.84 |
| Court Fees | $350.00 |
| Fedex | $584.11 |
| Postage | $89.33 |
| Secretarial Overtime | $145.60 |
| Photocopies | $6,681.86 |
| Travel | $2,173.92 |
| Meals | $588.29 |

The Second Circuit has held that reasonable, identifiable out-of-pocket disbursements ordinarily charged to clients are recoverable. *See U.S. Football League*, 887 F.2d 408, 416 (2d Cir. 1989); *see also Kuzma v. Internal Revenue Serv.*, 821 F.2d

930, 933-34 (2d Cir. 1987) (providing a non-exclusive list of recoverable costs, including photocopying, travel and telephone costs). Payment is not permitted, however, for items which constitute routine office overhead. *See LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 763 (2d Cir. 1998). In addition, Section 1988 does not always permit a court to shift expert fees to the losing party. *Wilder v. Bernstein*, 975 F.Supp. 276, 287 (S.D.N.Y. 1997) (noting that although the Civil Rights Act of 1991 amended 42 U.S.C. § 1988 to give courts discretion to award expert fees in Section 1981 cases, it did not extend that discretion to Section 1983 cases) (citing *West Virginia Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 102 (1991)).

Defendants argue that a reduction of 90% is appropriate with regard to plaintiff's claimed costs. The only case defendants cite in support of this argument, however, involved a situation where a plaintiff succeeded on a single claim that was severable from the vast majority of the litigation, prompting the court reviewing plaintiff's attorney's fees motion to reduce both the amount of attorney's fees and costs requested by plaintiff's attorneys by 90%. *See Betancourt v. Giuliani*, 325 F.Supp.2d 330, 333-35 (S.D.N.Y. 2004). As previously discussed, here, plaintiff's successful and unsuccessful claims are factually intertwined. Accordingly, the across-the-board reduction in costs taken in *Betancourt* is not appropriate here.

However, I conclude that I am without authority to require
defendants to reimburse plaintiff for expert fees. Although
plaintiff asserted a § 1981 claim in his amended complaint,
which, had he prevailed on it, would have permitted him to
recover expert fees,[18] plaintiff ultimately prevailed only on his
§ 1983 excessive force claims (in addition to his state law
battery claims). "In a Section 1983 case, the Court lacks the
authority to reimburse for expert fees[.]" *Duke v. County of
Nassau*, No. 97-CV-1495, 2003 WL 23315463, at *7 (E.D.N.Y. Apr.
14, 2003). Accordingly, the fees associated with expert
witnesses will be excluded from the reimbursement award.

With regard to plaintiff's costs, other than expert witness
fees, I am satisfied that they represent reasonable costs
associated with this matter that would be charged to a fee-paying
client. I therefore award reimbursement of costs in the amount
of $58,221.70.

IV. Determination of Interest

Plaintiff does not seek interest on his attorney's fees
award, as he correctly notes that the award already accounts for

---

[18] As a court in the Southern District noted, "In *West Virginia Univ.
Hosps., Inc. v. Casey*, 499 U.S. 83, 102 (1991), the Supreme Court held that 42
U.S.C. § 1988 did not convey the authority to shift expert fees to the losing
party as part of a 'reasonable attorney's fee' in a § 1983 case. . . . After
*Casey*, Congress enacted the Civil Rights Act of 1991, which amended 42 U.S.C.
§ 1988 to give courts discretion to shift expert fees to the losing party in
cases rising under 42 U.S.C. §§ 1981 and 1981(a). As Congress explicitly
limited the amendment to cases arising under § 1981, *Casey* still prohibits the
award of expert fees in § 1983 cases." *Wilder v. Bernstein*, 975 F.Supp. 276,
287, 287 n.12 (S.D.N.Y. 1997).

interest through the use of current hourly rates. *See LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998) (noting that in calculating the presumptively reasonable fee, "current rates, rather than historical rates, should be applied in order to compensate for the delay in payment") (citing *Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989)). However, plaintiff is entitled to interest on the costs he incurred during the litigation. *See Rozell v. Ross-Holst*, 576 F.Supp.2d 527, 548 (S.D.N.Y. 2008) (awarding interest on costs). Plaintiff requests that I apply the interest rate noted in 28 U.S.C. § 1961(a), the statute contemplating interest on money judgments, which provides, in relevant part, as follows:

> Interest shall be allowed on any money judgment in a civil case recovered in a district court. . . . Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding. [sic] the date of the judgment.

28 U.S.C. § 1961(a). Defendants have made no objection to plaintiff's request. This court's review reveals that the weekly average 1-year constant maturity Treasury yield for the week preceding the entry of judgment on November 20, 2008, was 1.12%.[19] Accordingly, as calculated from the date of the entry of judgment, plaintiff is entitled to recover $401.26 in interest on his costs.

---

[19] *See* http://www.federalreserve.gov/releases/h15/data/Weekly_Friday_/H15_TCMNOM_Y1.txt (last visited June 4, 2009).

## CONCLUSION

For the reasons set forth above, plaintiff is awarded $671,056.80 in attorney's fees, $58,221.70 in costs and $401.26 in interest. The Clerk is directed to transmit a copy of the within to the parties and the magistrate judge.


SO ORDERED.

Dated:     Brooklyn, New York
           June 25, 2008


                    By: /s/ Charles P. Sifton (electronically signed)
                        United States District Judge